UNITED STATES of America,
Plaintiff–Appellee,

v.

James Ralph HOYLAND,
Defendant–Appellant.

No. 89–50253.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted April 12, 1990.

Decided May 25, 1990.

As Amended Sept. 14, 1990.

Janet Sherman, Sherman & Sherman, Santa Monica, Cal., for defendant-appellant.

Stephen G. Wolfe, Asst. U.S. Atty., Los Angeles, Cal., for plaintiff-appellee.

Before BROWNING, NOONAN and FERNANDEZ, Circuit Judges.

NOONAN, Circuit Judge:

James R. Hoyland appeals his conviction of structuring his bank deposits with the intent of preventing the bank from reporting a deposit of $10,000 or more, 31 U.S.C. § 5324(3). In this case of first impression in this circuit, we affirm his conviction.

## FACTS

The parties stipulated to the facts as follows:

JAMES HOYLAND is charged with having engaged in currency transactions in United States currency with various financial institutions in amounts less than $10,000 in order to avoid the bank's filing of a currency transaction report (CTR). He opened a bank account with the Bank of Newport on October 14, 1986 and began making deposits in amounts less than $10,000 knowing the bank would not file a CTR. Mr. HOYLAND was told by bank employees and believed these transactions were legal, and in fact they were. At that time, there was nothing that prevented a bank customer from depositing sums of money less than $10,000 even if it was done with the intent of preventing a financial institution from filing a currency transaction report which would have been required if the deposit had been more than $10,000. From October 14, 1986 until February 9, 1987, Mr. HOYLAND deposited $61,433 in his account and wrote checks at various times for $53,975. For example, from De-

cember, 1986 to January, 1987, Mr. HOY-LAND wrote approximately $31,000 in checks to nautical or marine-type companies. Some of the deposit transactions occurred on the same day; some deposits charged in the indictment were made over a week period.

On January 27, 1987 with the passage by Congress of 31 U.S.C. § 5324, it became a crime to structure a transaction in such a way as to avoid a bank's filing of a currency transaction report. Mr. HOYLAND continued his transactions as before, and did each of the cash deposits and cash exchanges at the time and place alleged in the indictment with the intent that the bank would thereby not file currency transaction reports covering his transactions. No one told him it was now illegal, and Mr. HOYLAND never learned of the passage of the new law. The Government agrees that the defendant had no notice and/or knowledge of the new law.

The issue is whether or not a defendant who engages in what he believes are legal transactions can be found guilty of violating Section 5324(3) without the government showing that he had knowledge that it was illegal, although he committed the acts charged with the same intent as before January 27, 1987, i.e., preventing the filing of currency transaction reports.

### PROCEDURE

Hoyland was indicted on October 11, 1988. He moved to suppress evidence allegedly gathered by invalid search warrants. The motion was denied. Hoyland then moved on constitutional grounds to dismiss the indictment. The motion was denied. On January 17, 1989 the parties stipulated as set out above. Hoyland waived jury trial. On January 25, 1989 the government unsuccessfully moved to withdraw from the stipulation. The government then moved to dismiss the indictment without prejudice. The motion was denied. The court then found the defendant guilty.

### ANALYSIS

*The Search Warrants.* Hoyland renews his attack on the validity of the search warrants on the ground that they were issued without probable cause. The statement of probable cause for the first warrant was prepared by Allen J. Roth, an agent of the California Bureau of Narcotics Enforcement with fifteen years of experience as a police officer, with specialized training in narcotics investigation, and over 300 arrests of suspected drug traffickers. His affidavit stated that on September 10, 1987 he had received information from the Newport Beach Police Department that Hoyland was suspected of money laundering in violation of California Penal Code 186.10. The Newport Beach Police Department had been informed by the operations manager of the Bank of Newport that on February 6, 1987 Hoyland had deposited $7,000 at one branch of the bank and $8,242 at a second branch of the bank. Since October 14, 1986 Hoyland had deposited $61,433 with the bank, virtually all of it in cash. Over the period March 3–9, 1987 he made several cash deposits totalling $11,000. On February 24, 1987 Hoyland exchanged $3,500 in twenties for $3,500 in hundreds. He did the same as to $3,000 in twenties on April 27, 1987, and the same as to $5,000 on August 10, 1987 and again as to $5,000 on August 18, 1987. Winston, a narcotics search dog of the Orange County Sheriff's Department, alerted to the twenties deposited on February 26, 1987 and to those deposited on August 10, 1987.

Hoyland himself had obtained a teaching credential in 1968. He taught science at Edison High School in Huntington Beach. His salary was $44,414 per year. He lived at the Dana Point Athletic Club, renting two rooms for $450 per month. His movements were surveyed and he was found to board the Zamazaan, a 52.3 foot sailing vessel, net weight 31 tons, registered in his name.

Agent Roth declared that on the basis of his training, experience, and knowledge, he was of the opinion that Hoyland was part of a much larger organization involved in the drug traffic and the laundering of its proceeds. Agent Roth sought Hoyland's bank records and also any safe deposit box records in his name.

■ Plainly at this stage of the investigation there was probable cause for the warrant to issue. A high school teacher, living in modest circumstances, was depositing large sums of cash and making exchanges of bills in ways that justified an agent of Roth's experience concluding that here in all probability was a money launderer for a drug ring.

A second warrant to search the Zamazaan and Hoyland's residence was issued after Agent Roth reported that further cash transactions had been carried out similar to those already observed, that the Zamazaan was sailing in a race to Cabo San Lucas, Mexico, and that a truck was known to have been arranged with "supplies" for the yacht when it reached Cabo San Lucas.

■ Search of safe deposit boxes rented by Hoyland turned up $655,130 in cash and provided the basis for warrants to search further bank records and safe deposits. There is no doubt that these warrants, too, were based on probable cause. In today's America, a pattern of cash deposits and exchanges that have no obvious purpose except the avoidance of detection, plus the secreting of large amounts of cash in safe deposit boxes, all carried out by a man in modest circumstances, do not establish criminality but do give rise to a reasonable belief that the man is engaged in criminal conduct.

■ *The Denial of the Motion to Dismiss.* Hoyland argues that the government's motion to dismiss the indictment should have been granted. We conclude that Hoyland lacks standing to appeal this issue. It is an elementary rule of appellate procedure that "[o]nly one injured by the judgment sought to be reviewed can appeal." *Parr v. United States,* 351 U.S. 513, 516, 76 S.Ct. 912, 915, 100 L.Ed. 1377 (1956). Hoyland argues that he was "aggrieved" by the denial of the government's motion because his trial had commenced and, had the motion been granted, he could have invoked double jeopardy protection to bar any subsequent re-indictment and prosecution on the same charge. His argument is specious.

Under Rule 48(a), "a dismissal may not be filed during the trial without the consent of the defendant." Fed.R.Crim.P. 48(a). Here, the government moved for a dismissal *without prejudice* but did not obtain Hoyland's consent to the dismissal. There could have been no dismissal without Hoyland's consent; conversely, there could have been a dismissal *and* a subsequent re-indictment with Hoyland's consent. Because Hoyland did not consent to the motion as required by Rule 48(a) for a dismissal to have been filed, he lacks standing to complain that the motion should have been granted.

*The Mental Element Required by the Statute.* Hoyland's main case on appeal is pitched on the mental element necessary to be proved. The statute required that Hoyland, to be guilty, have the intent of causing the bank not to report his deposits totalling $10,000 or more. By the stipulation Hoyland has admitted that he had this intent. He argues, however, that a further mental state, which he did not have, was necessary for him to be guilty of a criminal act. He contends that he must have had *mens rea,* the bad purpose of breaking this law; as he did not know of this law, as indeed he had been told by bank employees that his acts were legal, he was innocent of any intent to violate the statute; his purpose was good; his mind was not guilty.

■ The Constitution does not require a knowingly criminal mind in order that an act be punished as criminal. It is no accident that this proposition was established in cases dealing with drugs, *United States v. Balint,* 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (seller of cocaine guilty although he did not know that it was a crime to sell cocaine); *United States v. Behrman,* 258 U.S. 280, 42 S.Ct. 303, 66 L.Ed. 619 (1922) (physician prescribing the equivalent of 3,000 doses of morphine and cocaine for a patient to use over several days chargeable with distributing drugs although the physician had literally complied with a statutory exception for a physician prescribing for a patient). In these drug cases the Supreme Court only considered the argument that Congress had required a

criminal intent; in each case the Supreme Court rejected the argument.

Hoyland argues that a specifically guilty mind is statutorily required here by the statute's use of the term "willfully." Only those "willfully" violating this law are punishable. 31 U.S.C. § 5322(b). He did not act willfully, he says, because he acted without knowledge of the law's existence.

It is appropriate to recall here Learned Hand's famous exchange with Professor Herbert Wechsler, the Reporter for the Model Penal Code of the American Law Institute. Wechsler had indicated that the ALI would include the definition of "willful" in the proposed code. Hand objected. It was, he said, "a very dreadful word." It was a word certain to cause difficulties. "If I were to have the index purged," he continued, " 'willful' would lead all the rest in spite of its being at the end of the alphabet." *See* American Law Institute, *Model Penal Code* § 2.02, p. 249.

Despite Hand's plea, the term was defined by the ALI and defined in the sense that it ordinarily bears in most statutes and in this statute: "A requirement that an offense be committed willfully is satisfied if a person acts knowingly with respect to the material elements of the offense, unless a purpose to impose further requirements appears." *Id.* at § 2.02(8). The definition accords with Hand's own: a requirement that conduct be "willful" generally "means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law." *American Surety Co. v. Sullivan,* 7 F.2d 605, 606 (2d Cir.1925).

In common law, the "ancient requirement of a culpable state of mind" was an essential element of a crime. *Morissette v. United States,* 342 U.S. 246, 250, 72 S.Ct. 240, 243, 96 L.Ed. 288 (1952). The Court in *Morissette* held that Congress retained the historic common law intent requirement when it codified common law crimes. To convict Morissette of knowing conversion of federal property, property which Morissette said he believed had been abandoned, the Court held the government had to prove the "evil state of mind" encompassed within the meaning of "wilful." *Id.* at 264, 72 S.Ct. at 250. *Morissette* reinforced the notion that criminal intent "generally remains an indispensable element of a criminal offense." *United States v. United States Gypsum Co.,* 438 U.S. 422, 437, 98 S.Ct. 2864, 2873, 57 L.Ed.2d 854 (1978).

Even the purely statutory, non-common law crime of violating 31 U.S.C. § 5316, which requires the filing of a customs form when entering or leaving the country with $10,000 or more, has been held to require an intent to break the law, without which there can be no crime, although the defendant knew he had the requisite amount of money and had filed no report of it. *See e.g., United States v. Chen,* 605 F.2d 433, 435 (9th Cir.1979); *United States v. Granda,* 565 F.2d 922, 926 (5th Cir.1978). Such cases, when combined with the rule of lenity in construing criminal statutes, provide the basis for Hoyland's argument that here, too, Congress intended to require a bad purpose to break the law before the defendant's conduct became culpable.

█ Thought-provoking as this contention is, we reject it as a matter of statutory construction. Congress had set the reporting requirement for the banks, 31 U.S.C. § 5313(a). Congress was aware that several circuits, including ours, had held it no crime to structure deposits so that the reporting requirement would not be triggered. S.Rep. No. 433, 99th Cong., 2d Sess. 22 (1986). Congress changed the law to make it a crime so to structure with the intent to prevent reporting. To act willfully under the statute is to act with this intent.

Unlike *Morissette,* no common law crime has been adopted by Congress. Unlike the tax and section 5316 currency reporting cases, structuring is not the kind of activity that an ordinary person would engage in innocently. Only the person who has a deliberate intention to frustrate the reporting by the banks is guilty of the offense. We concur in the analysis of the crime made by the Second Circuit in *United States v. Scanio,* 900 F.2d 485 (2d Cir. 1990). The statute is like the narcotics

statutes construed in *Balint* and *Behrman, supra:* intent to do the act suffices.

■ Hoyland contends that he did not have an evil state of mind because he was reassured by bank employees who told him that the structuring was legal. Such reassurances, of course, constituted no estoppel because the bank employees were not agents or licensees of the government. *Cf. United States v. Tallmadge*, 829 F.2d 767, 772–75 (9th Cir.1987) (firearms dealers are licensees of government). Even if the effect of these reassurances was to make Hoyland confident that he was not committing a crime, they did not affect or alter his deliberate intention to frustrate the reporting by the banks. Under the statute, that intention made him guilty.

■ *The Privilege Against Self–Incrimination.* Hoyland argues vigorously that as he is protected by the Fifth Amendment against incriminating himself, so he is protected against "ingeniously drawn legislation" that would require him to supply information that the government could use against him in a criminal prosecution. *Marchetti v. United States*, 390 U.S. 39, 52, 88 S.Ct. 697, 704–05, 19 L.Ed.2d 889 (1968). Hoyland's argument, however, misstates what the statute requires of him. It requires that he not structure his deposits so as to frustrate reporting by his bank. The statute does not impose upon him any duty of reporting. If there is a self-incrimination objection to be made it would have to be addressed as to what was required of him by a bank carrying out its reporting obligation. That issue is not before us.

■ *The Precision of the Statute.* Hoyland contends that in violation of the Fifth Amendment the statute is overbroad and void for vagueness because it gives no fair warning as to what is prohibited and is open to arbitrary enforcement. The objection is without merit. The statute identifies precisely the acts and intent that will constitute crime.

■ *Ex Post Facto Legislation.* Hoyland contends that he is being punished for acts that he thought were innocent when he started doing them and that, in fact, the acts were made illegal ex post facto and, therefore, unconstitutionally made criminal. The acts of which Hoyland was convicted were committed after January 25, 1987 when the statute went into effect. Hoyland has no argument whatsoever under this heading.

■ *The Sentence.* The sentence did not go beyond the statutory maximum. But Hoyland objects that after imposing the sentence the district court observed:

"... it is hard to escape the conclusion, that these transactions were somehow related to drug trafficking. It is hard— To me, that is a reasonable inference that can be made from the facts that are set forth in this report.

And the narcotic trafficking problem is probably one of the number one problems in this country and with seemingly respectable citizens like Mr. HOYLAND participating in it and aiding it and helping to make it work, it certainly doesn't help the authorities to stem the flow. Therefore, it seems to the Court that even if Mr. HOYLAND is free of any prior criminal record, because of his position, because of his education and his experience and background, he should have known better. It sets a very poor example that a high school teacher becomes a cog in the narcotic trafficking process, no matter how minor it might be; and this is by no means minor."

(R.T. 3–30–31)

Hoyland argues that there was no evidence of drug-dealing in the record, that it was a denial of due process of law to make such inferences, and that under *United States v. Safirstein*, 827 F.2d 1380 (9th Cir.1987), it was improper for the district court to regard him as part of a drug operation.

In *Safirstein* the defendant had been arrested at Los Angeles International Airport, bound for Panama and found with over $147,000 in money orders blank as to the payee; he had denied that he was carrying more than the statutory limit of $10,000. The district court characterized him as a drug trafficker. We found that there was "not the barest scintilla of evidence that Safirstein was connected with

narcotics," *id.* at 1387, and that "the record and the report could support inferences of other activities, legal or illegal, as readily as they support an inference of trafficking in narcotics." *Id.* at 1386. In the instant case a high school teacher with a modest salary possessed an expensive yacht that travelled to Mexico, kept in safe deposit boxes a staggering quantity of cash, and engaged in repeated acts of money laundering. Such conduct is inconsistent with innocent sources, such as inheritance, for the money; and the pattern and quantities are inconsistent with an illegal source such as gambling. To any person living in California in the 1980s the circumstances point to involvement in a drug ring for which the laundering was being done. Such an inference is a question of fact. We do not find the district court's finding of fact here to be clearly erroneous.

AFFIRMED.