**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**David A. DASHNEY,**
**Defendant–Appellant.**

**Nos. 90–1136, 90–1220.**

United States Court of Appeals,
Tenth Circuit.

June 27, 1991.

---

Jill M. Wichlens, Asst. Federal Public Defender, Denver, Colo. (Michael G. Katz, Federal Public Defender, with her on the brief), for defendant-appellant.

Robert D. Clark, Asst. U.S. Atty., Denver, Colo. (Michael J. Norton, U.S. Atty., with him on the brief), for plaintiff-appellee.

Before HOLLOWAY, Chief Judge, and BARRETT and SEYMOUR,* Circuit Judges.

HOLLOWAY, Chief Judge.

## I

Defendant-appellant, David Allen Dashney, appeals from his convictions and sentence after a jury trial on two counts of structuring and attempting to structure cash transactions in excess of $10,000.00 for the purpose of avoiding bank filings of currency transaction reports (CTRs), in violation of 31 U.S.C. § 5324(3), 31 U.S.C. § 5322(a), and 18 U.S.C. § 2.[1]

There was evidence tending to show that in December of 1989 Dashney won approximately $92,400, paid out in cash, playing blackjack at the Mirage Hotel in Las Vegas. VIII R. at 354–55; IV R. at 45–46. He was registered under the name David Allen, Allen being his middle name. VIII R. at 346–47; IV R. at 35, 77–78. After winning, Dashney went to Florida to talk to his broker at Dean Witter where he had an account. Dashney told his broker's secretary that he did not want to use a check to deposit his winnings because of the tax consequences. VI R. at 152, 162. Subsequently Dashney discussed with his broker the possibility of depositing cash up to a certain amount without any CTR being filed. *Id.* at 165. The broker had the impression that Dashney thought that he could legally do what he wanted to do. *Id.* at 178. Dashney's broker informed him, however, that the brokerage company could not accept cash deposits in any amount. *Id.* at 167–68.

Soon thereafter Dashney flew to Colorado Springs, Colorado, where he attempted to rent a car, using cash only. This unusual rental attempt was reported to the Sheriff, who sent two officers to investigate. *Id.* at 183–85. The officers asked if they could search Dashney and his bags and were given permission to do so. They counted out $100,000 in his bag. *Id.* at 185. Dashney told them that the money had been won in Las Vegas. *Id.* at 186. Dashney also said that he had not given the money to Dean Witter because he knew if he deposited over $9,999.99 in cash, the broker had to tell federal authorities. *Id.* at 187. Dashney was picked up at the airport by his friend Sandra Jarrett.

On December 14, 1989, Dashney obtained a Colorado driver's license, using Jarrett's address. IV R. at 96–97; VI R. at 235–36. On that same day, he and Jarrett went to ten banks in the Denver area where they attempted to purchase and successfully purchased eleven checks from eight of the banks, each check made out to David Dashney, with no check for over $10,000. IV R. at 96–100; IX R. at 7, 9. Dashney and Jarrett did not purchase checks from two banks contacted.

At FirstBank—Cherry Creek branch, Jarrett began a purchase of a cashier's check for $10,000, made out to Dashney. VI R. at 244. During this transaction the teller told them that if the amount was $10,000 or more, a "large-currency transaction report" would have to be filled out. *Id.* at 241–42. Dashney told the teller that he did not want the CTR filled out because he did

---

* Judge Seymour heard the argument in this case but did not participate in this decision.

1. Section 5324 states in part that "[n]o person shall for the purpose of evading the reporting requirements of section 5313(a) with respect to such transaction . . . structure or assist in structuring, any transaction with one or more domestic financial institutions." 31 U.S.C. § 5324. Section 5313(a) of Title 31 requires financial institutions to file reports of currency transactions involving more than $10,000.

Section 5322(a) of Title 31 provides in part that "[a] person willfully violating this subchapter . . . shall be fined not more than $250,000, or imprisonment [of] not more than five years, or both." Thus § 5322(a) acts to prescribe criminal penalties for a variety of Title 31 violations, including § 5324.

not want to pay taxes on the money. *Id.* at 243. He also told her that no CTR needed to be filed if a cashier's check for $9,999 were purchased. *Id.* at 242. Dashney then had the bank void the first check for $10,000 and issue a cashier's check to him for $9,999.99. *Id.* at 244, 249.

At World Savings—Cherry Creek branch Dashney purchased a cashier's check for $9,999.99, paid for with $100 bills. Dashney said he wanted to purchase ten checks for $10,000. He had the instructions portion of a CTR form in his hand when he approached the teller. *Id.* at 252, 254, 257–58. Dashney indicated to the teller that there was no need to report the money because it had been won in Las Vegas. *Id.* at 257.

At Commercial Federal Savings and Loan—Cherry Creek branch, Dashney raised the issue of CTRs, asking if one was required for a transaction of $10,000 or more. *Id.* at 262. The financial counselor told Dashney that he would definitely file a CTR for $10,000 or over and that it was discretionary as to filing one for lesser transactions. *Id.* at 262. Dashney purchased a bank check for $9,999.99 from the financial counselor and also purchased a cashier's check for $9,999.99 from a teller supervisor. *Id.* at 261, 263. Dashney again mentioned that he had won the money in Las Vegas. *Id.* at 266.

At FirstBank—Green Mountain branch, Dashney purchased a cashier's check for $5,000 from an operations supervisor. *Id.* at 270. Dashney inquired about purchasing a check for $9,999.99 and was informed that the bank would file a CTR for any transaction over $5,000. *Id.* at 271. Jarrett then attempted to purchase a cashier's check for $5,000 with Dashney's money. *Id.* at 273. The supervisor and the bank president decided that the two checks would have to be considered as a single transaction requiring a CTR, but Dashney indicated that he would not provide information for a CTR. *Id.* The second check was voided. *Id.* at 272. Dashney told the supervisor that the money had been won in Las Vegas and that such winnings are exempt from CTR rules. *Id.* at 278.

At Century Bank—Cherry Creek branch, Dashney inquired about a certificate of deposit for over $100,000. *Id.* at 283. He indicated that he was not pleased with the offered rate and would shop around. *Id.* at 283–85. Dashney then asked about purchasing a cashier's check for $100,000 but changed his mind after he was told that a CTR would have to be filed. *Id.* at 285–86, 292. Dashney then asked a vice president if a CTR had to be filed for transactions under $10,000 and was told that one would be filed. V R. at 130. Dashney then showed the instructions portion of a CTR form to the vice president, specifically the paragraph stating that no form need be filled out for transactions under $10,000. *Id.* at 131. The vice president responded that if there was suspicion that multiple transactions might add up to more than $10,000, they had to fill out a CTR. *Id.* Dashney became irritated and left the bank without conducting any transaction. *Id.*

At First National Bank of Lakewood, Dashney asked about purchasing a cashier's check for $10,000 and asked if a CTR would have to be filled out. VI R. at 296, 299. He noted that he had won the money in a casino. After being told that a CTR would be filed for a $10,000 transaction, Dashney pointed out the clause on the CTR form stating that casinos are exempt from CTR requirements. He then purchased a check for $9,999.99. *Id.* at 296–301.

At Capitol Federal Savings—Green Mountain branch, Dashney said he wanted to purchase a $10,000 cashier's check. When he was told that a CTR would have to be filled out for the transaction, he changed his purchase to a $9,999.99 cashier's check. Dashney told the savings counselor that he had won the money in Las Vegas and he showed her a gold watch he had purchased with the money. *Id.* at 305–310.

At Green Mountain Bank, Dashney asked to purchase a $10,000 cashier's check. When he was told that a CTR would be filled out, he objected, stating that only transactions over $10,000 required CTRs. The head teller told Dashney that it was discretionary as to whether

to fill out a CTR for any amount under $10,000. *Id.* at 312. Dashney then told the teller that he had already purchased over ten cashier's checks that day and he held up "in a fan-type motion backs of what looked like checks." *Id.* at 314. A few minutes later, Jarrett attempted to purchase a check for $9,999.99 at another teller's window but no check was obtained. *Id.*

At Cherry Creek National Bank, Dashney asked about purchasing a cashier's check for $30,000. He was told that a CTR would be filed for any transaction over $10,000, whereupon he decided to get a check for $10,000 instead. An unidentified woman accompanying Dashney then purchased a cashier's check for $9,999.99, payable to Dashney. VII R. at 324–25.

At World Savings and Loan—Lakewood Green Mountain branch, Dashney asked about a jumbo certificate, a certificate of deposit for $100,000 or more. VII R. at 337. He appeared unhappy with the offered rate, saying he could get better rates elsewhere. Dashney then purchased a $10,000 association check, similar to a cashier's check. *Id.* at 330–31. Jarrett purchased an association check for $5,000 payable to Dashney. Dashney initiated a discussion about CTRs and he said that one should not be filled out because the transaction was for only $10,000. *Id.* at 332, 333. During the conversation Dashney said that he had started off with $100,000 in cash and he was going from bank to bank purchasing cashier's checks, which he

showed to the teller in a stack. *Id.* at 336. The checks purchased by Dashney and Ms. Jarrett on December 14 totaled $99,999.93.

Dashney testified on his own behalf. He stated that he had won the money in Las Vegas, but that he thought that these winnings were reported to the government by the casino. IX R. at 3, 7. Dashney testified that he left the hotel on December 9 with $100,000; he had won $113,000 and had bought an expensive watch there. *Id.* at 3. Dashney testified that he was concerned about "bureaucratic problems" which might arise from having the same money reported to the government again when he bought cashier's checks. *Id.* at 8. He claimed that he had no intention of hiding the money and that he was purchasing cashier's checks only because Dean Witter would not accept cash. *Id.* at 9. Dashney said that several of the prosecution witnesses made incorrect statements in court. *Id.* at 17, 30, 34, 37, 41. A number of the checks were identified by Dashney as having been purchased by him. *Id.* at 44–49. Dashney also admitted that several of the bank employees had discussed CTRs with him. *Id.* at 32–41.

II

Dashney was charged in a two count indictment alleging that he had attempted to and had successfully structured transactions to evade the filing of CTRs, in violation of 31 U.S.C. §§ 5324(3), 5322(a) and 18 U.S.C. § 2.[2] He was convicted following a

---

**2.** The indictment reads in part:

COUNT 1

The Grand Jury charges that:

On or about December 14, 1989, in the State and District of Colorado, DAVID A. DASHNEY, for the purpose of evading the reporting requirements of 31 U.S.C. § 5313(a) and Title 31, Code of Federal Regulations, Section 103.-22(a)(1), knowingly, intentionally, and unlawfully structured or attempted to structure a transaction or transactions or knowingly, intentionally, and unlawfully induced, counseled, or commanded Sandra Jarrett to structure or attempt to structure a transaction or transaction, to wit: the purchase with cash on the same business day of $99,999.93 of cashiers checks payable to the order of DAVID A. DASHNEY, with one or more domestic financial institutions in metropolitan Denver, to

wit: [alleging transactions with eleven financial institutions] ... or knowingly, intentionally, and unlawfully procured or caused the structuring or attempted structuring of a transaction or transaction, to wit: the purchase of cash on the same business day of $99,999.93 of cashier's checks payable to the order of DAVID A. DASHNEY, with one or more domestic financial institutions, to wit: those transactions described above in violation of 31 U.S.C. §§ 5324(3), 5322(a), all in violation of 18 U.S.C. § 2.

COUNT 2

The Grand Jury charges that

On or about December 14, 1989, in the State and District of Colorado, DAVID A. DASHNEY, for the purpose of evading the reporting requirements of 31 U.S.C. § 5313(a) and Title 31, Code of Federal Regulations, Section 103.-

jury trial and was sentenced to 24 months' imprisonment pursuant to the Sentencing Guidelines. *See* United States Sentencing Commission, *Guidelines Manual* § 2S1.3 (Nov.1989).[3]

The defendant Dashney filed a motion to dismiss the indictment for vagueness and failure to charge knowledge of illegality. I R. Doc. 6. At a hearing on the motion it was argued more specifically that the indictment did not charge Dashney with knowledge of the antistructuring statute, 31 U.S.C. § 5324. After argument the trial judge denied the motion to dismiss by an oral ruling, rejecting the claim of vagueness. She further held that knowledge of illegality is not required; the defendant would be entitled to an instruction that his acts must be willful, that is, "done voluntarily and intentionally and with the specific intent to do something the law forbids, not because of accident or other innocent reason." II R. at 28–29. The judge said that the statute does contain a scienter element and that the government would have to show that defendant had knowledge that CTRs had to be filed and that the defendant structured his transaction, attempting to evade those reporting requirements. *Id.* at 29.

At a conference where instructions to the jury were discussed, the same issue was again raised by Dashney. His attorney referred to his earlier legal argument that the government must establish knowledge of illegality and the antistructuring statute. VIII R. at 427–29. The trial judge, however, did not instruct that knowledge of illegality was required to be proven by the government, and instead charged, *inter alia*, that the government must prove that the defendant knowingly and willfully structured or attempted to structure a currency transaction; and that the purpose of the structured transaction or attempted structured transaction was to evade the bank's reporting requirement. Instruction No. 12.

The judge further instructed that an act is done willfully if done voluntarily and intentionally, and with specific intent to do something the law forbids, that is to say with bad purpose either to disobey or disregard the law; that to evade or attempt to evade the reporting requirements of 31 U.S.C. § 5313(a) means that the defendant acted voluntarily and intentionally and with the specific intent to knowingly keep financial institutions from having sufficient information to prepare and file the currency transaction report; in other words, the evasion or attempted evasion must be made with the bad purpose of seeking to prevent financial institutions from making a written report of the currency transaction; and that knowingly means that the act or omission was done voluntarily and intentionally, and not because of a mistake or accident. Instruction No. 15. Further she instructed that the crime charged is a serious crime which requires proof of specific intent; that the government must prove that the defendant knowingly did an act which the law forbids, as knowingly was earlier defined, purposely intending to violate the law. Instruction No. 16. The defendant's attorney moved for a judgment of acquittal at the close of all the evidence, and this motion was denied.

Following his convictions and sentencing on Counts 1 and 2, the defendant appealed.

22(a)(1), knowingly, intentionally, and unlawfully attempted to structure a transaction or transactions, to wit: the purchase with cash of a series of cashiers checks, none of which is in excess of $10,000.00, totaling approximately $100,000.00, all such cashiers checks to have been payable to the order of DAVID A. DASHNEY, with one or more domestic financial institutions in metropolitan Denver, to wit: World Savings and Green Mountain Bank, in violation of 31 U.S.C. §§ 5324(3), 5322(a), all in violation of 18 U.S.C. § 2. I R. at 1–3. The government argued at a hearing on a motion to require the government to elect on which count it would proceed that the Count 1 transactions were completed, while those alleged in Count 2 were attempted, but unsuccessful. II R. at 6–12. The argument raised in this motion of defendant is addressed further in Part IV, *infra*.

3. The defendant's Las Vegas winnings were seized by the government in a civil forfeiture action pursuant to 18 U.S.C. § 981(a)(1)(A), 31 U.S.C. § 5324(3), 21 U.S.C. § 881(a)(6), and Supplemental Rule for Certain Admiralty and Maritime Claims C(2). *See* I R. Doc. 9, Ex. Q.

## III

■ Dashney argues three main points on appeal in challenging his convictions on both counts. First, it is claimed that the district court erred in denying Dashney's motion to dismiss the indictment for failure to charge knowledge of illegality. *See* I R. Doc.10. Second, it is claimed that the jury instructions improperly failed to instruct the jury that knowledge of illegality must be proved for conviction under 31 U.S.C. §§ 5322(a) and 5324(3). Third, it is argued that the district court erred in denying Dashney's motion for judgment of acquittal since no evidence was presented that Dashney had knowledge of the illegality of his actions. The gravamen of all of these claims is that for a conviction under 31 U.S.C. §§ 5322(a) and 5324(3), it must be established that the defendant had knowledge of the prohibition of structuring transactions in the criminal statutes.

Although this is the first time such an argument has been made in this circuit under the antistructuring law, a similar contention has been presented and rejected in both the Ninth and Second Circuits. *See United States v. Hoyland*, 914 F.2d 1125, 1128–29 (9th Cir.1990); *United States v. Scanio*, 900 F.2d 485, 489–91 (2d Cir.1990). Dashney, however, says that the argument has never been properly considered in light of the complete legislative history of 31 U.S.C. §§ 5322(a) and 5324(3) and the recent Supreme Court decision in *Cheek v. United States*, —— U.S. ——, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991).

Section 5324 of Title 31 was part of the Money Laundering Control Act of 1986, which was Title I, Subtitle H of the Anti–Drug Abuse Act of 1986. Pub.L. No. 99–570, 100 Stat. 3207 (1986). There were no Senate or House Reports submitted with the bill as passed, but there were a number of related Congressional reports submitted on proposed versions of the various portions of the final bill. 1986 U.S.Code Cong. & Ad.News 5393.[4]

Dashney primarily relies on two reports—one by the House Committee on the Judiciary and one by the House Committee on Banking, Finance and Urban Affairs. The report from the House Committee on the Judiciary contained a proposal, not adopted, to change "willfully" to "knowingly" in § 5322. *See* H.R.Rep. No. 855, 99th Cong., 2d Sess. 7, 27 (1986) (hereinafter Judiciary Committee Report). The report explains that the term "willfully" has been interpreted as "having different meanings and requiring differing standards depending on the context." *Id.* at 21. The report then says that "willfully" in this context has been interpreted as requiring an "actual awareness of the reporting requirement to sustain violations." *Id.* at 22. The report also states that the proposed alteration to "knowingly" was not intended to change the meaning of the statute, but only to express the requisite state of mind more clearly. *Id.* at 21–22. This portion of the legislative history is relied on heavily by Dashney on this appeal.[5]

Dashney also relies on the report from the House Committee on Banking, Finance and Urban Affairs, which echoes the aforementioned Judiciary Committee Report and states that "[i]n the criminal context the term 'knowingly' means with specific intent to commit a violation of the Bank Secrecy Act" or "specific intent to commit a crime." H.R.Rep. No. 746, 99th Cong., 2d Sess. 29, 41 (1986) (hereinafter Banking Committee Report). The heading for this discussion is "Clarifying the 'State of Mind' Standard for Criminal and Civil Money Penalties." *Id.* at 28–29.

---

4. When committee reports are used in divining legislative intent, the reports used are usually those which accompanied the proposed and enacted legislation. It has been said that "[c]oncerning those parts of the bill passed as introduced by the committee without change, it is reasonable to assume that the legislature adopted the intent of the committee." Sutherland Stat. Const. § 48.06 at 308 (4th Ed). This is not the case before this court as the reports discussed were attached to rejected proposed bills.

5. We note that the legislation proposed in this House Judiciary Committee Report contained no prohibition on structuring. Thus, the interpretations of "willfully" were not made with reference to legislative proposals on an antistructuring law.

Although the House reports show that two House Committees recognized some ambiguity in the term "willfully," and suggested that it be revised to "knowingly," this provides us with little guidance, for this proposed change was not made. Dashney argues that the change to "knowingly" —the proposed "clarification"—was not made because Congress deemed it unnecessary since "knowingly" was already implicit in the statute, thus showing legislative intent in accord with Dashney's contention that proof of knowledge of the antistructuring statute and the illegality of his actions are required for a conviction. Therefore, according to Dashney, we should interpret the statutes in question here, §§ 5324(3) and 5322(a), as requiring specific knowledge of illegality of structuring under the antistructuring provision in § 5324(3). Or, in any event, Dashney says there is such ambiguity that we should thus construe the statutes under the rule of lenity, citing *Bifulco v. United States,* 447 U.S. 381, 387, 400, 100 S.Ct. 2247, 2252, 2258, 65 L.Ed.2d 205 (1980), and *United States v. Bass,* 404 U.S. 336, 347–48, 92 S.Ct. 515, 522, 30 L.Ed.2d 488 (1971).

While criminal intent is not specifically addressed, it is implicitly dealt with in another related report from the Senate Committee on the Judiciary. *See* S.Rep. No. 433, 99th Cong., 2d Sess. (1986) (hereinafter Senate Report). The report gives an example of the intended application of the proposed statute:

> For example, a person who converts $18,000 in currency to cashier's checks by purchasing two $9,000 cashier's checks at two different banks or on two different days with the specific intent that the participating bank or banks not be required to file [CTRs] for those transactions, would be subject to potential civil and criminal liability. A person conducting the same transactions for any other reasons ... would not be subject to liability under the proposed amendment.

Senate Report at 22. Thus, this Report contemplates a criminal intent element for prosecution for structuring crimes, but the intent required is merely to avoid the currency transaction reporting requirements, and not specific knowledge of the antistructuring law itself. We are not persuaded that the legislative history as a whole impels a construction of the statutes in the restrictive manner which Dashney suggests.

Dashney further submits that in any event the rule of lenity should be applied here, in his favor, due to ambiguity of the currency transaction report statutes. *See Bifulco v. United States,* 447 U.S. 381, 387, 100 S.Ct. 2247, 2252, 65 L.Ed.2d 205 (1980). *Bifulco,* however, notes that the touchstone of the rule of lenity is statutory ambiguity. *Id.* at 387, 100 S.Ct. at 2252. We feel, however, that the intent of Congress in the statute's usage of the term "willfully" in § 5322(a) was to adopt the interpretation of the statute explained in *United States v. Scanio,* 900 F.2d 485 (2d Cir.1990):

> The meaning of the term 'willful' depends upon the context in which it is used, see *United States v. Stroud,* 893 F.2d 504, 507 (2d Cir.1990) (quoting *Screws v. United States,* 325 U.S. 91, 101, 65 S.Ct. 1031, 1035, 89 L.Ed. 1495 (1945) (plurality opinion)), and *a requirement that an act be done 'willfully' normally does not necessitate proof that the defendant was specifically aware of the law penalizing his conduct.* Where the law imposes criminal liability for certain conduct, a requirement that the conduct be 'willful' generally 'means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he is breaking the law.' *American Surety Co. v. Sullivan,* 7 F.2d 605, 606 (2d Cir.1925) (L. Hand, J.); *United States v. Gregg,* 612 F.2d 43, 51 (2d Cir.1979) ('It is well settled that ignorance of the law is no defense to purposeful and intentional action.' (citing *Lambert v. California,* 355 U.S. 225, 228, 78 S.Ct. 240, 242, 2 L.Ed.2d 228 (1957)).
>
> . . . .
>
> ... With respect to the applicable *mens rea,* the legislative history indicates that Congress only intended to re-

quire proof that the defendant structured a currency transaction in order to prevent the financial institution from filing a CTR.

900 F.2d at 489, 491 (emphasis added).

The Ninth Circuit's opinion in *United States v. Hoyland*, 914 F.2d 1125 (9th Cir. 1990), persuasively makes the same interpretation of the statutes, concluding, *id.* at 1129:

> Congress was aware that several circuits, including ours, had held it no crime to structure deposits so that the reporting requirement would not be triggered. S.Rep. No. 433, 99th Cong., 2d Sess. 22 (1986). Congress changed the law to make it a crime so to structure with the intent to prevent reporting. To act willfully under the statute is to act with this intent.

*See also United States v. 316 Units of Municipal Securities*, 725 F.Supp. 172, 178 (S.D.N.Y.1989) (to restrict prosecutions to those few cases in which the government could prove actual knowledge of the antistructuring statute would contravene the legislative intent to broaden the scope of the currency reporting statute) (dictum). Hence we feel that the rule of lenity does not benefit Dashney here since the statutes' intent is not unclear.

Finally, Dashney says that "willfully" in the penalty provision of 31 U.S.C. § 5322 has previously been interpreted as requiring knowledge of illegality in relation to other violations of Title 31 and should therefore be interpreted in the same manner regarding violations of § 5324(3). *See United States v. Eisenstein*, 731 F.2d 1540, 1543 (11th Cir.1984) (importation and exportation of over $10,000 without filing a CTR, in violation of 31 U.S.C. §§ 1059, 1081, 1082 (1976)); *United States v. Granda*, 565 F.2d 922, 926 (5th Cir.1978) (importation of over $5,000 without filing a CTR, in violation of 31 U.S.C. §§ 1058, 1101).[6] Furthermore, Dashney argues that the interpretation of "willfully" as requiring knowledge of illegality is supported by *Cheek v. United States*, — U.S. —, 111 S.Ct. 604, 112 L.Ed.2d 617 (1991). *Cheek* holds that, in a criminal tax violation context, "the standard for the statutory willfulness requirement is the 'voluntary, intentional violation of a known legal duty.'" *Cheek*, 111 S.Ct. at 610.

Both *Eisenstein* and *Granda* involve what is now recodified, in amended form, as 31 U.S.C. § 5316, requiring reports to be filed upon the exporting or importing of over $10,000 across United States borders. *See Eisenstein*, 731 F.2d at 1542; *Granda*, 565 F.2d at 923. The requirement of knowledge of illegality is necessary there because "[t]he isolated act of bringing money in excess of $5,000 into the country is not illegal or even immoral." *Granda*, 565 F.2d at 926; *see Eisenstein*, 731 F.2d at 1543. An innocent traveler could certainly decide to go overseas carrying a large amount of money or traveler's checks, and absent knowledge of the reporting requirements, there is no reason to believe that such activity can be a crime. When typically innocent behavior is criminalized, there is a strong argument for requiring a person to have knowledge of the illegality of his actions to justify a conviction. *See Lambert v. California*, 355 U.S. 225, 228–29, 78 S.Ct. 240, 242–43, 2 L.Ed.2d 228 (1957). In the case before us, however, and in context of the statutes before us, no wholly innocent person faces such a predicament since a scienter element is incorporated into both 31 U.S.C. §§ 5324 and 5322.

The prohibition of the antistructuring statute, § 5324, includes this basic proviso —*"no person shall for the purpose of evading the reporting requirements of section 5313(a) ..."* 31 U.S.C. § 5324 (emphasis added). Innocent or accidental structuring of transactions does not trigger § 5324, and consequently, both Dashney's indictment and his jury instructions properly included the element of willful intent to evade the reporting requirements. *See* I R. Doc. 1; I R. Doc. 27, Instruction No. 12, 15–16.

*Cheek* addresses "willfulness" in the context of criminal violations of federal tax

---

**6.** The relevant currency reporting statutes were originally codified at 31 U.S.C. §§ 1051–1101 (1976). They were revised and recodified at 31 U.S.C. §§ 5311–26 (1986).

statutes. *Cheek*, 111 S.Ct. at 609. The Court stated that

The general rule that ignorance of the law or a mistake of law is no defense to criminal prosecution is deeply rooted in the American legal system....

The proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws. Congress has accordingly softened the impact of the common-law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses. Thus, the Court almost 60 years ago interpreted the statutory term 'willfully' as used in the federal criminal tax statutes as carving out an exception to the traditional rule. This special treatment of criminal tax offenses is largely due to the complexity of the tax laws.

*Id.*

Dashney argues that the complexity of the statutes governing the reporting of monetary transactions is equal to that of the tax statutes and, thus, a similar exception to the general rule should be made in interpreting these reporting statutes. We disagree. *Cheek* involves only certain criminal tax statutes, and we see no reason to extend similar statutory interpretation into the straightforward currency reporting requirements. Criminal tax statutes are more analogous to the international currency reporting statutes involved in *Granda* and *Eisenstein*, since entirely innocent actions can lead to violations of the law. *See Hoyland*, 914 F.2d at 1129; *Scanio*, 900 F.2d at 490–91. As previously noted, Dashney's actions were anything but innocent, as he went to great lengths to avoid the filling out of CTRs in connection with his transactions. The various witnesses' testimony regarding Dashney's comments, along with the several checks under the $10,000 mandatory reporting limit, indicate that Dashney was quite aware of the reporting requirement and intended to evade such reporting.

In sum, we are not persuaded that the trial judge's instructions were in error or that the government's proof was lacking as to an essential element. The evidence amply supported the guilty verdicts on the charges which were tried.

## IV

■ After argument of this appeal, defendant Dashney was granted leave to file a supplemental brief asserting an issue not argued in his original briefs or at argument. The substance of this claim of error was argued below, however, by a pretrial motion.[7] The gist of this contention is that it was fundamental error for the government to divide the allegations of defendant's acts at the various banks into two charges of structuring on which Dashney received two convictions, two special assessments of $50, and his sentence of 24 months' imprisonment under the Sentencing Guidelines. *See* Counts 1 and 2, note 2, *supra.*

The government has filed a response to defendant Dashney's supplemental brief arguing that there are bona fide distinctions between the conduct charged in Counts 1 and 2; that each count alleges a cognizable violation of 31 U.S.C. § 5324(3); and that therefore there was no multiplicity in the charging of two separate counts. And the government says that the defendant Dashney was in no way harmed by having been charged in two counts in any event, since his sentence on two counts did not involve any additional imprisonment, fine or restitution order, and that the imposition of a second $50 special assessment in the judgment was *de minimis.*

The government makes no objection to our considering the additional issue and we

---

**7.** The motion below was titled "MOTION TO REQUIRE GOVERNMENT TO ELECT DUE TO DUPLICITY IN INDICTMENT," but it actually was directed at the multiplicity of the indictment, arguing that "[b]oth counts allege the same wrongful conduct on behalf of the defendant." I R. Doc. 3. Duplicity refers to the inclusion of various offenses in a single count of an indictment, while multiplicity refers to multiple counts of an indictment which cover the same criminal behavior. *United States v. Chrane*, 529 F.2d 1236, 1237 n. 3 (5th Cir.1976).

conclude that we should do so since it goes to the fundamental validity of one conviction and one $50 special assessment, and might affect the sentence imposed. We feel we should decide this new issue as a proper exercise of our discretion since injustice might otherwise result. *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). We have therefore considered the recent opinion of the Seventh Circuit which Dashney relies on, *United States v. Davenport*, 929 F.2d 1169 (7th Cir.1991), and have reconsidered our record in light of that opinion.

*Davenport* involved a similar situation where the defendants were charged with separate counts of violation of the antistructuring statute, 31 U.S.C. § 5324(3). There Count 1 charged a conspiracy to violate § 5324(3), Count 2 charged one violation of the antistructuring statute, consisting of the making of ten deposits viewed as an effort to "structure" an $81,500 transaction, and the last ten counts charged each of the ten same deposits as separate violations of the statute. The court held that these latter ten counts were invalid:

> These counts should have been thrown out. The statute does not forbid the making of deposits. It forbids the structuring of a transaction. The Davenports received $100,000 in cash, which they wanted to deposit. *The receipt and deposit of the $100,000 were the transaction that the Davenports structured by breaking it up into multiple deposits, of which ten had been made when they were caught. There was one structuring, one violation.* The government's position leads to the weird result that if a defendant receives $10,000 and splits it up into 100 deposits he is ten times guiltier than a defendant who splits up the same amount into ten deposits.

*Id.* at 1171 (emphasis added). The court stated further:

> The statute's aim was to prevent people from either causing the (usually innocent) bank to fail to file a required report or defeating the goal of the requirement

that large cash deposits be reported to the Internal Revenue Service *by breaking their cash hoard into enough separate deposits to avoid activating the requirement.* S.Rep. No. 433, 99th Cong., 2d Sess. 22 (1986); *United States v. Scanio, supra*, 900 F.2d at 488.

*Id.* at 1173 (emphasis added).

We must agree with the defendant that the rationale of *Davenport* clearly applies to the facts in the instant case. As in *Davenport*, there was one "cash hoard" involved here. Count 1 of the indictment here alleges that the defendant Dashney "structured or attempted to structure a transaction or transactions" with the purchase on the same business day of $99,999.93 in cashier's checks at ten banks. Count 2 here alleged that Dashney attempted to structure a transaction or transactions with the purchase of cashier's checks totaling approximately $100,000, alleging transactions at two banks.[8] It is clear from our record that the same $100,000 fund was involved in the conduct alleged in both counts. Dashney testified that he left the hotel in Las Vegas on December 9 with $100,000, after he had won $113,000 and then bought an expensive watch there. IX R. at 3. Following his trip to Florida, he returned to Colorado Springs and there he told two officers from the Sheriff's Department that his bag contained $100,000 he had won in Las Vegas, and they counted out $100,000 in his bag. VI R. at 185–86. Then, in one day—December 14, 1989—Dashney and his friend Jarrett went to all the banks covered by the charges in Counts 1 and 2, making the purchases or attempted purchases of cashier's checks. This record thus shows that Dashney, throughout the events alleged, was dealing with the same fund of approximately $100,000 brought from Las Vegas and which he attempted repeatedly to use in separate purchases of cashier's checks for $10,000 or less. The persuasive opinion in *Davenport* convinces us that here also there was a multiplicity of charges, splitting up one unit of prosecution contem-

---

8. Only one of these two banks was not involved in Count 1.

plated by the statute into two separate counts.

The government makes two unconvincing arguments to avoid the *Davenport* holding. First, the government suggests that a distinction exists here between the counts; that Count 2 charged only attempted structuring transactions, which were not consummated, and that "there is a logical separation between consummated structured transactions and attempted but unconsummated structured transactions." Government Response at 4. We see no logic in this argument. This interpretation would mean that if one sets out to structure transactions so as to avoid CTRs on one $100,000 cash hoard by buying ten cashier's checks, and all ten purchases succeeded, only one structuring count would be proper. But if two checks of the ten were not obtained, then one would be guiltier and two structuring counts could be charged relating to the same efforts to avoid CTRs on one cash hoard. As the court said in *Davenport*, 929 F.2d at 1171, about a similar contention, "[t]he government's position leads to [a] weird result...." The basic violation of structuring by attempting to conceal *one* large cash hoard, during one day's conduct, underlies both counts charged against Dashney. They concerned only *one* structuring violation in our opinion.

The remaining contention of the government is that Dashney has suffered no harm by being charged in two separate counts. It is true that such multiple counts are grouped together for sentencing purposes. *See* U.S.S.G. §§ 3D1.2(d) and 3D1.3(b). Nevertheless, separate convictions are involved and an additional conviction does bear an onus that the defendant is entitled to be relieved of, if invalid. The government says that the extra $50 special assessment is *de minimis*. Apparently the Congress did not think so and directed imposition of the assessments on separate valid convictions. We have held that a separate invalid special assessment of $50 would prevent the application of the concurrent sentence doctrine. *United States v. Sullivan*, 919 F.2d 1403, 1429 n. 42 (10th Cir. 1990).

In sum, we are convinced that the *Davenport* result is sound and that it requires the vacation of the conviction on Count 2 here.

## V

Accordingly, the conviction on Count 1 is AFFIRMED. The conviction on Count 2 is REVERSED. The cause is remanded to the district court to vacate the sentence and resentence the defendant in accord with this opinion.

IT IS SO ORDERED.