UNITED STATES

v.

**Eugene H. KUSHNER, Steven E. Shecter, and Wayne R. Cushing, Defendants.**

No. CR.A.02–10166–WGY.

United States District Court, D. Massachusetts.

April 10, 2003.

Michael J. Pineault, United States Attorney's Office, Boston, MA, for U.S. Attorneys.

Law Office of Richard Egbert, Peter C. Horstmann, Law Offices of Partridge, Ankner & Horstmann, LLP, Robert L. Sheketoff, Attorney At Law, Joseph F. Savage, Testa, Hurwitz & Thibeault, LLP, James L. Sultan, One Commercial Wharf North, Boston, MA, for Eugene H. Kushner, Steven E. Shecter, Wayne R. Cushing, Defendants.

## MEMORANDUM

YOUNG, Chief Judge.

## I. INTRODUCTION

### A. Background

On May 16, 2002, a federal grand jury returned a 126–count Indictment arising out of activities associated with an unlicensed money-lending and check-cashing business, charging Eugene Kushner ("Kushner"), Steven Shecter ("Shecter"), and Wayne Cushing ("Cushing") (collectively, "the Defendants") with various forms of criminal activity, including money laundering.

Specifically, the Indictment charges (1) the Defendants with conspiracy to violate the various state and federal laws listed below (Count One); (2) Kushner and Shecter with operating an illegal money transmitting business in violation of 18 U.S.C. § 1960 (Counts Two and Three); (3) Kushner and Shecter with unlawfully structuring transactions to evade currency reporting requirements in violation of 31 U.S.C. § 5324 (Counts Four through One Hundred Four); (4) Kushner and Shecter with unlawfully failing to file Currency Transaction Reports ("CTRs") in connection with checks that they cashed in amounts exceeding $10,000 in violation of 31 U.S.C. §§ 5313, 5322 (Counts One Hundred Five through One Hundred Twenty–Three); (5) Kushner, Shecter, and Cushing with structuring transactions to evade currency reporting requirements at a particular bank in violation of 31 U.S.C. § 5324 (Count One Hundred Twenty Four); (6) Cushing with making false entries in bank books in violation of 18 U.S.C. § 1005 (Count One Hundred Twenty–Five); and (7) Cushing with obstruction of justice in violation of 18 U.S.C. 1503 (Count One Hundred Twenty–Six).

The Defendants subsequently moved to dismiss all but Counts Two and Three of the Indictment. In their motion, the Defendants argued that various counts in the Indictment are duplicitous, multiplicitous, mutually exclusive, and time-barred. Defs.' Mem. [Docket No. 31]. On April 7, 2003, the Court allowed the Defendants' motion in part and denied it in part. The following memorandum sets forth the basis of that decision.

### B. The Facts [1]

The Government alleges that Kushner and Shecter operated an unlicensed money-lending and check-cashing business between January 1995 and February 1999. Indictment [Docket No. 1] ¶¶ 4–5. Kushner and Shecter extended loans to individual borrowers and small business owners at "usurious rates of interest," ranging up to—and sometimes exceeding—256 percent per year. *Id.* The payment instruments used by Kushner and Shecter included checks, business receipts, and business receivables, all of which they accepted, exchanged for cash, and negotiated for fees. *Id.* On several occasions, the two men distributed currency to clients in amounts exceeding $10,000. *Id.* ¶ 24. Although federal law required CTRs to be filed in connection with many of these transactions, none were filed. *Id.*

Furthermore, the Government alleges that Kushner and Shecter "funneled" their business receipts through various accounts they controlled at Fleet Bank and BankBoston. *Id.* ¶¶ 6, 14–15. During the time period in question, Kushner and Shecter deposited over $15 million into these accounts and withdrew large sums of money from the accounts by cashing checks against them. *Id.* ¶¶ 14–16, 23. Specifically, the Government charges that Kushner and Shecter structured their withdrawals of this currency in particular increments so as to avoid any single withdrawal that would have exceeded the $10,000 reporting threshold established by the Department of the Treasury. *Id.* Cushing is charged with assisting Kushner and Shecter in so structuring withdrawals at the Bank of Braintree and with falsifying bank records. *Id.* ¶¶ 25–26.

## II. DISCUSSION

The Defendants argue that (a) Count One of the Indictment is duplicitous; (b)

---

1. Because the Defendants are moving to dismiss the Indictment, the Court construes the facts as averred by the Government.

Counts Four Through One Hundred Four are multiplicitous; (c) Counts Four through One Hundred Four and Counts One Hundred Five through One Hundred Twenty–Three are mutually exclusive; and (d) Counts One and One Hundred Twenty–Four through One Hundred Twenty–Six are time-barred.

### A. Duplicitous Counts

■ The inclusion of various offenses in a single count of an indictment makes that count duplicitous. *United States v. Verrecchia*, 196 F.3d 294, 297 (1st Cir.1999). The Defendants argue that Count One alleges one conspiracy but actually encompasses three distinct conspiracies, each involving different goals or participants.

■ The First Circuit has held, however, that whether a defendant has participated in a single conspiracy or in multiple conspiracies is a question of fact to be resolved by the jury at trial. *United States v. LiCausi*, 167 F.3d 36, 45 (1st Cir.1999); *United States v. Drougas*, 748 F.2d 8, 17 (1st Cir.1984). Furthermore, whether one or multiple conspiracies exist turns on whether the evidence demonstrates that "all of the alleged coconspirators directed their efforts towards the accomplishment of a common goal or plan." *Drougas*, 748 F.2d at 17. As the Supreme Court has held, "[t]he allegation in a single count of a conspiracy to commit several crimes is not duplicitous, for the conspiracy is the crime, and that is one, however diverse its objects." *Braverman v. United States*, 317 U.S. 49, 54, 63 S.Ct. 99, 87 L.Ed. 23 (1942) (internal citations and quotation marks omitted). Because the question of whether all the Defendants were engaged in a common scheme or plan is a question of disputed fact, it must be re-

solved at trial. *See, e.g., United States v. Nattier*, 127 F.3d 655, 657–58 (8th Cir. 1997).

### B. Multiplicity

■ With respect to the structuring counts against the Defendants, however, the Indictment is indeed multiplicitous. An indictment is multiplicitous if it charges a single offense in more than one count. *United States v. Brandon*, 17 F.3d 409, 422 (1st Cir.1994). In the instant case, the Indictment contains over 100 counts of "structuring" in violation of 31 U.S.C. § 5324. The Defendants argue that such counts are multiplicitous because each count merely represents a component of a single course of conduct—that is, one "structuring." The Government, however, responds that each count represents an independent act of structuring.

Federal law states that no person shall "structure, or assist in structuring, or to attempt to structure or assist in structuring, any transaction with one or more financial domestic institutions." 31 U.S.C. § 5324(a)(3). The Supreme Court has defined "structuring" under section 5324 to be the "break[ing] up [of] a single transaction above the reporting threshold into two or more separate transactions—for the purpose of evading a financial institution's reporting requirement." [2] *Ratzlaf v. United States*, 510 U.S. 135, 136, 114 S.Ct. 655, 126 L.Ed.2d 615 (1994).

■ In the case at bar, the Government has charged the Defendants with independent structuring counts for each day in which the Defendants attempted to avoid the federal reporting requirements. In determining the "allowable unit of prosecution," however, courts have stated that

---

**2.** Federal law requires banks and other financial institutions to file CTRs with the Secretary of the Treasury whenever they are in-

volved in a cash transaction that exceeds $10,000. 31 U.S.C. § 5313; 31 C.F.R. § 103.22(b)(1).

"no provision of the statute indicates that a single course of structuring can be segmented based on 12–month intervals (*or any other intervals of time*) or by the amount of funds in any interval." *United States v. Handakas*, 286 F.3d 92, 98 (2d Cir.2002) (emphasis added). Rather, courts look to the "source of the funds structured" in determining the allowable unit of prosecution. *Id.; see also United States v. Nall*, 949 F.2d 301, 307–08 (10th Cir.1991) (holding that there was only one source for three separate bank deposits where all of the money came from one lump sum and that, accordingly, there was only one structuring count); *United States v. Davenport*, 929 F.2d 1169, 1172 (7th Cir.1991) (holding that "the structuring itself, and not the individual deposit, is the unit of crime"); *United States v. Dashney*, 937 F.2d 532, 541 (10th Cir.1991) (same). In other words, the unit of prosecution "is not determined by the number of fractional, sub-liminal transactions made for concealment." *Handakas*, 286 F.3d at 99.

The Government attempts to distinguish *Handakas*, but its contentions are unavailing. Principally, the Government argues that the Defendants split up each "day's withdrawal into multiple withdrawals so that no single sub-withdrawal would exceed the $10,000 reporting threshold." Government's Supplemental Mem. [Docket No. 41] at 2. This corresponds, the Government contends, to "the unit of time utilized by the defendants themselves ...." *Id.* This "unit of time," however, is precisely analogous to the arbitrary time-based units proscribed by *Handakas*.

The Defendants did not "structure" on a daily basis. For example, the Government points to Count Seventy–Six in which the Defendants are charged with structuring a day's transaction on October 20, 1997 into three separate withdrawals of $9,387 to avoid the $10,000 reporting threshold. *Id.* at 2 n. 1. It is not the day, however, that is critical or even significant to the structuring here. *All* of the money within the Defendants' accounts was the product of the Defendants' unlicensed business, and it was the sum in its entirety that the Defendants sought to conceal. They achieved concealment by avoiding daily reporting requirements, but the amounts of the daily withdrawals are irrelevant. For example, the Defendants allegedly withdrew a total of $28,161 on October 20, but the Government has not alleged that this total daily withdrawal was independently significant—only that each individual withdrawal was less than $10,000. It is conceivable, however, that the Defendants could have made an additional withdrawal of $9,387 for a total of $37,548 on October 20, or made one fewer withdrawal for a total of $18,774.[3] It is no more compelling to argue that the amount the Defendants were structuring at any given time spanned two days, two weeks, or two months than to argue that they were structuring daily transactions.

It is true that the instant case involves withdrawals from a bank—as opposed to deposits—thus making it more difficult to trace funds to particular sources.[4] That is,

**3.** Indeed, the Government points out in its memorandum, for example, that on certain days, the Defendants made two separate withdrawals, rather than three. Government's Supplemental Mem. at 2 n. 1.

**4.** The Government argues that the Defendants are akin to loan sharks or bookmakers in that their activities involve daily inflows and out-

flows of cash that are not linked to single, identifiable amounts. Simply because it would be difficult to identify these inflows, however, does not absolve the Government of the responsibility to avoid multiplicitous indictments. Clearly, the amounts received by the Defendants derived from particular sources. Once deposited, it may be difficult to trace the origins, but the Government has

however, the essence of money laundering. If the Government chooses to identify the various sources from which the money in the Defendants' accounts was derived, that is, the various amounts "paid" by the Defendants' "clients" or "customers," the Government could so charge these transactions as separate structuring counts under the reasoning of *Handakas*. Otherwise, the Government may only sustain one count of structuring that spanned the relevant time period.[5] In sum, the structuring as alleged here was not conducted so as to withdraw discrete amounts of money daily to avoid the reporting requirements; it was structured so that the daily reporting requirements would reveal neither the overall scheme, nor the substantial amounts of cash the Defendants illegally received from various sources.[6]

### C. Mutual Exclusivity

█ Despite the Defendants' protestations to the contrary, the Indictment does not present "mutually exclusive" counts. Counts One Hundred Five through One Hundred Twenty–Three present allegations of different courses of criminal conduct than those presented by the structuring counts discussed above. As the government correctly points out, the structuring counts—although multiplicitous—involve the Defendants' attempts

willfully to cause certain banks to refrain from filing otherwise required CTRs; the CTR counts against the Defendants, however, involve separate conduct wherein the Defendants *themselves* were obligated to file CTRs because of transactions that occurred between them and their own clients or customers. In other words, the law assigned the Defendants two distinct duties—both of which they allegedly breached—related to two distinct courses of conduct. Whether the facts are as alleged by the Government and whether the courses of conduct were in fact distinct are questions for trial.

### D. Time–Barred Counts

█ The Defendants' challenge to the tolling agreements in this case is meritless. The Defendants do not challenge validity in the execution of the agreements, nor do they suggest any ambiguity or defect in the language. Rather, the Defendants argue that the government violated an implied covenant of "good faith" by not engaging in plea discussions in good faith. Defs. Mem. at 16–17. Even assuming *arguendo* that such an implied covenant of good faith inheres in the agreements, unsuccessful plea negotiations and a lengthy indictment hardly suggest bad faith. The Defendants simply cannot support any such claim. A contention of bad faith on

---

significant resources at its disposal to conduct the necessary investigations and identify the various sources.

**5.** The Government's fear of being "whipsawed" with a challenge that a revised count is duplicitous is unfounded. The unit of an individual act of "structuring," as explained above, derives from the source of the transaction. The Government may either identify the source at issue here as the sum of cash in the Defendants' accounts or by the particular amounts derived from their various clients or customers. Each unit of prosecution may constitute a separate count. Therefore, so long as the Government appropriately identi-

fies the unit of prosecution in its Indictment, no challenge that a count is duplicitous could prevail.

**6.** The Court notes that this reasoning does not apply to the various counts for failing to file CTRs under 31 U.S.C. §§ 5313, 5322 because the law requires a report for each day that cash transactions with a bank exceed $10,000. Therefore, for each day in which a required CTR was not filed, the Defendants may be charged with a separate violation of the statute. This analysis—as outlined in Part "C" below—is far different from the analysis under section 5324.

the part of the government is a serious accusation and is entirely without merit in this case.

## III. CONCLUSION

For the foregoing reasons, the Motion to Dismiss [Docket No. 30] was ALLOWED in part and DENIED in part. The motion was ALLOWED with respect to Counts Four through One Hundred Four and Count One Hundred Twenty–Four, with leave granted to the Government to file a superseding indictment in conformity with this order.[7]  The motion was otherwise DENIED.

SO ORDERED.

**7.** This order would appear to have no effort on the ultimate sentence to be imposed should the Defendants be convicted. Under the "real offense" approach of the United States Sentencing Guidelines, it is the amount of funds actually structured that is the driving force behind the sentence which must be imposed. U.S. Sentencing Guidelines Manual § 2S1.1(a) (2002). What appears to be driving the Government here is its desire to have a lengthy verdict slip with as many opportunities to convict as possible. The Government well knows that a conviction on a single small count (despite acquittal on all the other counts) brings with it the opportunity to seek a sentence based upon acquitted as well as convicted conduct. *United States v. Watts,* 519 U.S. 148, 154, 117 S.Ct. 633, 136 L.Ed.2d 554 (1997) (holding that "a sentencing court may consider conduct of which a defendant has been acquitted"). In the Byzantine and hypocritical world of today's Sentencing Guidelines, such a tendency toward multiplicity is an unfortunate consequence of the Supreme Court's decision.