UNITED STATES of America,
Appellant in No. 92–7174,

v.

Ronald P. SHIRK, Appellant
in No. 92–7123.

Nos. 92–7123, 92–7174.

United States Court of Appeals,
Third Circuit.

Argued Oct. 5, 1992.

Decided Dec. 3, 1992.

As Amended Feb. 16, 1993.

Stephen Robert LaCheen (argued), Anne M. Dixon, LaCheen & Associates, Philadelphia, PA, James W. Evans, Mette, Evans & Woodside, Harrisburg, PA, for appellant cross appellee.

James J. West, U.S. Atty., Dennis C. Pfannenschmidt (argued), Asst. U.S. Atty., Barbara E. Kittay, Sarah Elizabeth Jones, Susan R. Klein, U.S. Dept. of Justice, Harrisburg, PA, for appellee cross appellant.

Before: GREENBERG, COWEN and WEIS, Circuit Judges.

## OPINION OF THE COURT

COWEN, Circuit Judge.

On August 14, 1991, a jury convicted defendant Ronald P. Shirk on two counts of willfully structuring currency transactions in violation of 31 U.S.C. §§ 5324(3) (1988) and 5322(b) (1988). Departing downward from the Sentencing Guidelines range, the district court sentenced Shirk to nine months imprisonment. He appeals, asserting that we should vacate his conviction because: (1) the Government's proof was insufficient; (2) the indictment was defective; (3) the jury instructions were erroneous; and (4) the district court admitted improper expert testimony from a Government witness. In the alternative, Shirk asks us to remand with instructions for

calculating a further reduced sentence under the Guidelines. The Government cross-appeals, asserting that we should remand for resentencing within the range prescribed by the Guidelines.

We will affirm Shirk's conviction and deny his request for a remand with instructions for a reduced sentence. We will grant the Government's request for a' remand with instructions for resentencing within the applicable guideline range.

## I.

In 1968, while Shirk was a full-time police officer, he and his wife Bonnie began operating a gun dealership from their home in Lebanon, Pennsylvania. Shirk's dealership, Ron Shirk's Shooter Supplies, has since evolved into one of the nation's largest wholesale firearm distributorships. .

On February 14, 1990, Internal Revenue Service agents acting on a tip executed a search warrant at Shirk's business premises, resulting in the seizure of business records from 1984 to 1987. During the search, one of the agents asked Shirk if he kept any currency on the premises. He responded that one to two million dollars was stored in a safe in the basement. After obtaining additional search warrants, the agents seized $1,481,100 in $100 bills, 700 $20 gold pieces, and 3,748 silver dollars from the basement safe. Also seized from a safe located on the main floor was $149,-900 in $100 bills, $80,680 in smaller denomination bills, and several hundred gold coins. Shirk informed one of the agents that the $80,680 in smaller bills was working capital for the business. Shirk stated that he was going to put this money in the bank, but that he intended to deposit it in amounts under $10,000 so that no currency transaction reports ("CTRs") would be filed with the IRS. Shirk asked the agent if that were illegal.

Following an investigation, a federal grand jury returned an eleven count indictment on October 30, 1990. The indictment charged Shirk with income tax violations (counts 1–8), structuring currency transactions for the purpose of evading reporting requirements (counts 9–10), and criminal forfeiture (count 11).

At trial, the government presented bank records as evidence in support of the structuring charges. The records showed that from January 1, 1987 to March 5, 1989, Shirk made forty-four deposits at Lebanon Valley National Bank in currency amounts over $10,000. During this period, Shirk had an exemption from the bank allowing him to deposit up to $20,000 without having a CTR filed. During the week of March 13, 1989, the bank informed Shirk that his exemption had been revoked. From that time until the IRS agents executed their search warrant on February 14, 1990, Shirk made approximately 88 currency deposits.[1] None of these deposits exceeded $10,000.

Records introduced at trial also showed that on February 6, 1990, Shirk made a sale to a customer for which he received $30,000 in cash. There was no corresponding $30,-000 deposit into Shirk's business account. However, currency deposits of $9,000, $7,000, $9,300, and $7,000 were made on February 7, 8, 12, and 13, 1990 respectively.

Finally, the evidence established that three money orders were purchased on September 6, 8, and 13, 1989 in the amounts of $9,500, $9,800, and $9,500, respectively. These money orders were signed "Ron Shirk and Bonnie Shirk", and were presented together by Shirk on or about September 26, 1989 to purchase property at a real estate closing.

Gerald MacReady, an IRS agent, testified for the government as an expert in financial investigations and money laundering. He explained to the jury the nature of a CTR and the types of information regarding currency transactions that a bank is required to disclose. MacReady also explained the term, "structuring." He opined that the currency deposits made by Shirk after the bank revoked his CTR filing ex-

---

1. Most of the deposits were made at Lebanon Valley National Bank. Some were made at Jonestown Bank.

emption were structured. He also offered his opinion that the three money order purchases in September 1989 were structured.

Timothy Sandoe, a vice-president at Lebanon Valley National Bank, also testified for the Government. He stated that when he became Shirk's account officer, Shirk usually made only one very large deposit per week, either on Sunday night or on Monday morning. Sandoe recalled recommending that Shirk make more frequent deposits so he could earn more interest, and so the bank could avoid having to process a single huge deposit on Monday mornings. Sandoe testified that Shirk eventually agreed to make more than one weekly deposit. At trial, Shirk sought to establish that he began making more frequent deposits in amounts of less than $10,-000 on the basis of Sandoe's recommendations, and not for the purpose of evading federal reporting requirements.

On August 14, 1991, the jury convicted Shirk on the two structuring counts. Shirk was acquitted on the eight tax counts. The forfeiture verdict on count eleven was sealed pending formalization of settlement discussions between the parties. This led to a stipulation for settlement, and on March 13, 1992 the court dismissed count eleven. The district court entered a final order of forfeiture on March 17, 1992.

Following conviction, the probation officer filed a presentence report recommending that Shirk's base offense level under the Sentencing Guidelines be decreased by two levels for acceptance of responsibility. After the report was issued, however, the government located $360,900 in $100 bills in a safety deposit box in the name of Bonnie Shirk. According to the probation officer, Shirk claimed that the money located in the deposit box had been joint personal assets until transferred to Bonnie Shirk in November 1990. Additional investigation led the government to yet another safety deposit box in the name of Bonnie

Shirk containing $256,000 in $100 bills. The probation officer then filed a memorandum with the district court recommending that Shirk not receive a downward adjustment for acceptance of responsibility. The memorandum reasoned that Shirk had provided misleading information regarding the transfer of assets to his wife in a financial affidavit.[2] The memorandum recommended no upward adjustment for obstruction of justice, however, on the grounds that Shirk's falsehoods were not material. App. at 555.

On March 3, 1992, at sentencing, the district court calculated Shirk's base offense level at thirteen pursuant to Guidelines § 2S1.3(a)(1)(A). Finding that Shirk had structured funds totalling in excess of $600,000, the district court figured in a four-level increase pursuant to Guidelines §§ 2S1.3(b)(2) and 2S1.1(b)(2)(E). The court accepted the probation officer's recommendation that Shirk not receive either a downward adjustment for acceptance of responsibility or an upward adjustment for obstruction of justice. Although the final offense level of seventeen called for a prison sentence of 24–30 months, the district court, relying on Guidelines § 5K2.0,[3] departed from the recommended range and sentenced Shirk to nine months imprisonment. The district court reasoned that Shirk's case was "atypical" mainly because he was acquitted of criminal tax charges and was subject to a substantial financial forfeiture. App. at 240.

Shirk mounts several challenges to his conviction on appeal. He claims that the proof at trial was insufficient to convict him and that the Government's indictment was defective for lack of specificity. He also maintains that the district court's jury instructions were inadequate and that its admission of IRS agent MacReady's expert testimony was plain error. With respect to his sentence, he contends that, because his offense was only technical, the district

---

**2.** Prior to the filing of its initial presentence report, the probation office had received an affidavit stating that Shirk and his wife held $7,800 cash in joint assets. Shirk left blank a question asking whether he had transferred any

assets valued at greater than $1,000 during the past three years.

**3.** This section is a policy statement discussing appropriate grounds for departures.

court misinterpreted the Sentencing Guidelines by applying base offense level thirteen, rather than base level five. He also contends that the district court enhanced his offense level to seventeen based on an unsubstantiated factual finding that he structured funds in excess of $600,000.

On cross-appeal, the Government claims that the district court erred in departing downward from the applicable guideline range. The Government also asserts that the Guidelines require a further enhancement of Shirk's offense level for obstruction of justice.

## II.

■ We first address Shirk's claim that the Government's proof is insufficient. The standard of review for a claim of insufficient proof is whether substantial evidence supports the jury's verdict. *United States v. Sturm*, 671 F.2d 749, 751 (3d Cir.) (per curiam), *cert. denied*, 459 U.S. 842, 103 S.Ct. 95, 74 L.Ed.2d 86 (1982). In deciding this issue, we consider the evidence and all reasonable inferences in the light most favorable to the government. *Id.*

Title 31 U.S.C. § 5313(a) and applicable federal regulations require banks to file a CTR whenever more than $10,000 is deposited, withdrawn, exchanged, paid, or transferred, unless the transaction is exempted in accordance with the regulations. 31 U.S.C. § 5313(a) (1988); 31 C.F.R. § 103.22 (1992). Shirk was convicted of violating 31 U.S.C. § 5324(3), which provides: "No person shall for the purpose of evading the reporting requirements of section 5313(a) ... structure or assist in structuring, or attempt to structure or assist in structuring, any transaction with one or more domestic financial institutions." Willful violations of section 5324(3) are made criminally punishable by 31 U.S.C. § 5322(a), (b).

■ Shirk contends that the inadequacy of the proof against him stems from the Government's mistaken interpretation of what constitutes a structured "transaction" under the anti-structuring statute. Shirk asserts that the Government failed to understand that structuring a "transaction" under 31 U.S.C. § 5324(3) means artificially

breaking down an identifiable pool of funds, or cash hoard, of more than $10,000 into smaller component amounts. As a result, says Shirk, the Government failed to prove that the deposits charged in count nine were artificially broken down pieces of a pre-existing pool of funds equalling more than $10,000. According to Shirk, this failure of proof requires reversal of his conviction.

Neither the statute nor the regulations require the Government to prove the existence of a cash hoard in excess of $10,000 to obtain a conviction. In defining the term, "structure," the regulations provide that "a person structures a transaction if that person ... conducts or attempts to conduct one or more transactions in currency, in any amount, at one or more financial institutions, on one or more days, *in any manner*, for the purpose of evading the reporting requirements." 31 C.F.R. § 103.-11(p) (1992) (emphasis added).

> "In any manner" includes, *but is not limited to,* the breaking down of a single sum of currency exceeding $10,000 into smaller sums, including sums at or below $10,000, or the conduct of a transaction, or series of currency transactions, including transactions at or below $10,000. The transaction or transactions need not exceed the $10,000 reporting threshold at any single financial institution on any single day in order to constitute structuring within the meaning of this definition.

*Id.* (emphasis added).

As the regulations make clear, the conduct proscribed "is not limited to" the breaking down of an identifiable cash hoard of greater than $10,000. Rather, the law prohibits currency transactions made "in any amount ... in any manner, for the purpose of evading the reporting requirements." *Id.* Thus, to convict Shirk, the government had to prove only that Shirk willfully made deposits of $10,000 or less for the purpose of evading the federal reporting requirements. It did not have to prove that his deposits were artificially constructed pieces of a specific pool of cash equalling more than $10,000.

■ Applying the proper definition of a structured "transaction," we find sufficient evidence from which a rational jury could have found Shirk guilty beyond a reasonable doubt. The Government introduced records showing that Shirk made more than forty deposits exceeding $10,000 during the one and a quarter years that he was exempt from CTR filing requirements, but no deposits exceeding $10,000 during the year after his exemption was revoked. Based on the evidence that Shirk began altering the amount of his cash deposits at approximately the same time that the bank informed him he was no longer exempt from the reporting requirements, the jury reasonably could infer that he structured his cash deposits in amounts of less than $10,000 specifically for the purpose of evading the reporting requirements.

Shirk's own statements support this conclusion. While his business premises were being searched, Shirk told an agent that he intended to deposit $80,680 in business capital in amounts under $10,000 so that no CTRs would be filed with the Internal Revenue Service. Given Shirk's admission that he was planning to structure future deposits in amounts under $10,000 for the purpose of avoiding the CTR filing requirements, the jury reasonably could infer that he had structured his prior deposits of less than $10,000 for the exact same reason.

Shirk argues that the evidence adduced at trial comports as much with his theory that he repeatedly deposited amounts of cash under $10,000 for legitimate business reasons, as with the government's theory that he deposited less than $10,000 to evade federal reporting requirements. True or not, this argument misses the point. Whether Shirk structured his deposits under $10,000 for legitimate reasons, or to evade the reporting requirements, was a question for the jury. Our function is therefore limited: we must uphold the jury's verdict if we find, as we do, that substantial evidence supports it.

4. Because each count of the indictment refers to a single plan of structuring, of which each specified transaction was a component part, Shirk's claim that the indictment suffers from duplicity also fails. *See Blockburger v. United States*, 284

### III.

Having clarified an important element of proof required for a structuring conviction, we now address whether the indictment identified this and other elements with sufficient specificity. Count nine charges that Shirk, in violation of 31 U.S.C. §§ 5324(3) and 5322(b),

did knowingly and willfully for the purpose of evading the reporting requirements of Title 31, United States Code, Section 5313(a) and the regulations promulgated thereunder, structure, caused to be structured, assist in the structuring, and attempt to structure and assist in the attempted structuring of transactions with one or more domestic financial institutions, as part of a pattern of illegal activity involving more than $100,000 in a 12 month period, as more particularly described below....

App. at 9. There follows a list of ninety cash deposits specified by date and dollar amount. Count ten contains similar language, except the listed transactions are three money order purchases specified by date, dollar amount, and the bank at which the money orders were purchased.

■ Shirk first argues that the indictment lacks specificity because it fails to identify a particular "transaction" of more than $10,000 that was artificially constructed, or "structured," into smaller amounts of $10,000 or less. This argument has its roots in Shirk's mistaken assumption that the Government was required to prove the existence of a structured pool of funds in excess of $10,000 to win a conviction. Our definition of a structured "transaction" undermines this challenge to the indictment. Because the Government did not have to prove that Shirk structured a preexisting cash pool of more than $10,000, it did not have to identify any such cash pool in the indictment.[4]

U.S. 299, 302, 52 S.Ct. 180, 181, 76 L.Ed. 306 (1932) (stating that "when the impulse is single, but one indictment lies, no matter how long the action may continue") (citation omitted).

■ Shirk also argues that counts nine and ten fail to specify whether the listed deposits and money order purchases are intended to describe the charged structured "transactions" or the charged "pattern" of criminal activity. He adds that count nine is defective because it fails to name the domestic financial institutions at which the ninety cash deposits were allegedly made. These arguments lack merit.

■ An indictment is sufficient if it includes the elements of the offense intended to be charged, apprises the defendant of what he or she must be prepared to meet at trial, and enables the defendant to show with accuracy to what extent he or she may plead an acquittal or conviction as a bar to subsequent prosecution. *Russell v. United States,* 369 U.S. 749, 763–64, 82 S.Ct. 1038, 1047, 8 L.Ed.2d 240 (1962); *United States v. Rankin,* 870 F.2d 109, 112 (3d Cir.). Generally, an indictment may track the language of the statute, as long as "those words of themselves fully, directly, and expressly, without any uncertainty or ambiguity, set forth all the elements necessary to constitute the offense intended to be punished." *Hamling v. United States,* 418 U.S. 87, 117, 94 S.Ct. 2887, 2907, 41 L.Ed.2d 590 (1974) (quoting *United States v. Carll,* 105 U.S. 611, 26 L.Ed. 1135 (1882)). We have stated that "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Olatunji,* 872 F.2d 1161, 1166 (3d Cir.1989) (quoting *Rankin,* 870 F.2d at 112).

■ Counts nine and ten of Shirk's indictment comply with the requirements of notice and specificity outlined above. Both counts closely and unambiguously track the language of the anti-structuring statute, and charge each element of the underlying offense. *See* 31 U.S.C. §§ 5324(3), 5322(b). The indictment also sets forth specific facts relevant to each offense, including the dates and dollar amounts of the ninety cash deposits and three money order purchases that the Government alleged to be structured. Count ten also names the bank at which the money orders were purchased. This confluence of statutory language and specific factual allegations satisfies Fed.R.Crim.P. 7(c) and minimal constitutional standards of sufficiency. *See Olatunji,* 872 F.2d at 1168 (tracking language supplemented by specific allegations of criminal activity was sufficient). Nothing further is required.[5]

### IV.

■ We next consider Shirk's claim that the district court's charge to the jury set forth a prejudicially low standard of criminal intent. Violations of the prohibition against structuring are criminally punishable only if done "willfully." 31 U.S.C. §§ 5322(b), 5324(3). Shirk contends that the jury could convict him of "willfully" violating the prohibition against structuring only if the Government proved, beyond a reasonable doubt, that he knew structuring is illegal. Shirk argues, therefore, that the district court erred by failing to instruct the jury that knowledge of illegality is required for a conviction.

The *mens rea* required for a conviction under the anti-structuring statutes presents a question of first impression in this circuit. As Shirk acknowledges, however, courts of appeals reaching this issue uniformly have concluded that a conviction for structuring does not require proof that the defendant knew his or her conduct is ille-

---

5. Also lacking merit is Shirk's argument that count ten is defective because it fails to identify transactions sufficient in amount to constitute the charged "pattern of illegal activity involving more than $100,000 in a 12 month period." Although Shirk is correct that the money order purchases listed in count ten total less than $100,000, participation in a pattern of illegal activity involving more than $100,000 in a 12 month period is not an element of the underlying offense of structuring; it is an element of sentencing enhancement under 31 U.S.C. § 5322(b). Because Shirk's sentence falls within the more lenient sentencing parameters of 31 U.S.C. § 5322(a), which does not require proof of a pattern of illegal activity involving more than $100,000, Shirk cannot claim prejudice from the Government's failure to adequately specify such a pattern.

gal. *See, e.g., United States v. Rogers,* 962 F.2d 342, 344–45 (4th Cir.1992); *United States v. Brown,* 954 F.2d 1563, 1568–69 (11th Cir.), *cert. denied,* —— U.S. ——, 113 S.Ct. 284, 121 L.Ed.2d 210 (1992); *United States. v. Dashney,* 937 F.2d 532, 538–40 (10th Cir.), *cert. denied,* —— U.S. ——, 112 S.Ct. 402, 116 L.Ed.2d 351 (1991); *United States v. Hoyland,* 914 F.2d 1125, 1128–29 (9th Cir.1990); *United States v. Scanio,* 900 F.2d 485, 489–91 (2d Cir.1990). For example, the Court of Appeals for the Second Circuit held in *Scanio* that the "willfulness" requirement is met by proof that the defendant "(1) knew that the bank was legally obligated to report currency transactions exceeding $10,000 and (2) intended to deprive the government of information to which it is entitled." *Scanio,* 900 F.2d at 491; *accord Brown,* 954 F.2d at 1568.

Our analysis of the *mens rea* under the anti-structuring statutes begins with the statutory language. *See American Tobacco Co. v. Patterson,* 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982). Structuring a transaction is unlawful under 31 U.S.C. § 5324(3) if it is done "for the purpose of evading the reporting requirements of section 5313(a)." On the one hand, a defendant cannot structure a transaction "for the purpose" of evading legal reporting requirements unless he or she knows that such reporting requirements exist.[6] On the other hand, a defendant can structure transactions "for the purpose" of evading reporting requirements without knowing that the law prohibits such structuring.

■ Title 31 U.S.C. § 5322(b), which imposes criminal penalties on persons who "willfully" violate section 5324(3), does not alter this balance. A requirement that criminal conduct be "willful" generally "means no more than that the person charged with the duty knows what he is doing. It does not mean that, in addition, he must suppose that he. is breaking the law." *Scanio,* 900 F.2d at 489 (quoting

*American Surety Co. v. Sullivan,* 7 F.2d 605, 606 (2d Cir.1925) (L. Hand, J.)). This canon of construction derives from the well settled principle that ignorance of the law or mistake of law generally is no defense in criminal prosecutions. *See Cheek v. United States,* 498 U.S. 192, ——, 111 S.Ct. 604, 609, 112 L.Ed.2d 617 (1991).

Only in certain limited contexts have courts interpreted the term "willfully" as requiring proof of an intentional violation of a known legal duty. Shirk points to two such contexts, which he contends are analogous to the present case. First, Shirk argues that this case is similar to cases involving prosecutions for failure to file Currency and Monetary Instrument Reports under 31 U.S.C. § 5316 (1988). When interpreting the term "willfully" in section 5322 in the context of violations of section 5316, courts in other circuits have required knowledge of the law making the defendant's conduct illegal. *See, e.g., United States v. Dichne,* 612 F.2d 632, 636 (2d Cir.1979) (construing prior versions of sections 5316 and 5322), *cert. denied,* 445 U.S. 928, 100 S.Ct. 1314, 63 L.Ed.2d 760 (1980). Shirk argues that it would be inconsistent to interpret "willfully" as requiring a lesser *mens rea* in structuring cases under section 5324(3). Second, Shirk asserts that structuring is a *malum prohibitum* regulatory offense, which, like other such offenses, requires knowledge of illegality. Shirk relies principally on *United States v. Pomponio,* 429 U.S. 10, 12, 97 S.Ct. 22, 24, 50 L.Ed.2d 12 (1976), in which the Supreme Court held that "willfulness" in the context of prosecutions for income tax violations means "intentional violation of a known legal duty."

Neither analogy is fitting. Section 5316 obligates individuals to report currency imports and exports in excess of $10,000. Courts have required knowledge of illegality in the context of section 5316 because that section regulates "otherwise innocent

---

**6.** Judge Greenberg would hold that a defendant can structure a transaction unlawfully if he is aware of the reporting requirements even though he does not know that they are derived from law. *See United States v. Dollar Bank* *Money Market Account,* 980 F.2d 233 (3d Cir. 1992). Of course, this view does not preclude him from joining in the opinion and judgment subject to this caveat.

transactions." *Scanio*, 900 F.2d at 491. The conduct proscribed by section 5324(3) is not similarly "innocent." Section 5324(3) prohibits structuring a transaction "for the purpose of evading" federal reporting requirements. It targets individuals who know of a financial institution's legal obligation to file reports, and who purposefully act to prevent the bank from providing the government with the information to which it is entitled. Section 5324(3), therefore, contains an element of wrongfulness, or culpability, that is not present in section 5316. *See id.; Hoyland*, 914 F.2d at 1129 (noting that "structuring is not the kind of activity that an ordinary person would engage in innocently").

Shirk's reliance on *Pomponio*, a case involving tax violations, is also misplaced. In *Cheek*, 498 U.S. at ——, 111 S.Ct. at 609, the Supreme Court limited the *Pomponio* definition of willfulness to tax cases, which require "special treatment" because of the "complexity of the tax laws."

> The proliferation of statutes and regulations has sometimes made it difficult for the average citizen to know and comprehend the extent of the duties and obligations imposed by the tax laws. Congress has accordingly softened the impact of the common-law presumption by making specific intent to violate the law an element of certain federal criminal tax offenses.

*Id.* The currency reporting and structuring laws are not as complex as the often Byzantine tax code. Consequently, we need not extend to the anti-structuring statutes the same "special treatment" of defining "willfulness" as the specific intent to violate the law. *See Dashney*, 937 F.2d at 540.

The legislative history of the anti-structuring statutes lends unqualified support to our interpretation of the criminal *mens rea*. In 1986, Congress enacted section 5324(3) to resolve a dispute among circuits as to whether structuring to evade federal reporting requirements was a crime. *See*

S.Rep. No. 433, 99th Cong., 2d Sess. 21–22 (1986). In so doing, Congress sought to codify *United States v. Tobon–Builes*, 706 F.2d 1092 (11th Cir.1983), and like cases. S.Rep. No. 433, *supra*, at 21–22. In *Tobon–Builes*, the Court of Appeals for the Eleventh Circuit held that the defendant's "willfulness was clearly established by evidence showing he knew about the currency reporting requirements and that he purposely sought to prevent the financial institutions from filing required reports." 706 F.2d at 1101.[7] As the same court noted recently in *Brown*, 954 F.2d at 1569, it is likely that in codifying *Tobon–Builes* Congress intended to adopt the holding "that knowledge of the reporting requirements and intent to evade them constitute the 'willful' state of mind required [for a structuring conviction]."

In a Senate Report, the Committee on the Judiciary provides an example of punishable structuring, which illustrates the *mens rea* Congress intended to adopt:

> [A] person who converts $18,000 in currency to cashier's checks by purchasing two $9,000 cashier's checks at two different banks or on two different days with the *specific intent that the participating bank or banks not be required to file Currency Transaction Reports* for those transactions would be subject to potential civil and criminal liability.

S.Rep. No. 433, *supra*, at 22 (emphasis added). The only necessary culpability is the "specific intent" to prevent the participating bank or banks from filing CTRs. There is no requirement of a specific intent to violate the anti-structuring laws.

In the present case, the district court instructed the jury that the Government had to prove, beyond a reasonable doubt, that Shirk "willfully structured ... a currency transaction" and that "the purpose of the structured transaction was to evade the reporting requirement that the bank had." App. at 460. The court reiterated that the jury could not convict Shirk unless it found that he "intentionally structured

---

7. The defendant in *Tobon–Builes* was prosecuted for structuring under 18 U.S.C. § 1001 (concealing a material fact from the government by trick, scheme or device) and 18 U.S.C. § 2(b) (causing another to commit an offense).

his currency transactions for the purpose of evading the reporting requirement that had been imposed upon the bank." *Id.* at 461. These charges adequately covered the *mens rea* of structuring under section 5324(3): knowledge of the legal reporting requirements and the intent to prevent the bank from furnishing the required information.[8]

Shirk also argues that the district court erred in failing to instruct the jury that the element of willfulness would be negated if he believed in good faith that his banker, Timothy Sandoe, had the authority to permit him to structure his deposits in amounts under $10,000 without violating the law. Because knowledge of the illegality of structuring is not part of the criminal *mens rea*, Shirk was not entitled to a jury instruction on good faith. *See Hoyland,* 914 F.2d at 1130.[9]

### V.

We now consider Shirk's claim that the district court committed reversible error by admitting the expert testimony of IRS Agent MacReady. Because Shirk's counsel failed to object contemporaneously with the admission of MacReady's testimony, we review the district court's admission of the testimony under the plain error standard of Fed.R.Crim.P. 52(b). *See Government of the Virgin Islands v. Smith,* 949 F.2d 677, 681 (3d Cir.1991). Rule 52(b) provides that "[p]lain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court."

The Supreme Court repeatedly has cautioned courts of appeals to invoke the plain error doctrine "sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result." *United States v. Young,* 470 U.S. 1, 15, 105 S.Ct. 1038, 1046, 84 L.Ed.2d 1 (1985) (quoting *United States v. Frady,* 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 1592 n. 14, 71 L.Ed.2d 816 (1982)). We are instructed to reverse

only "particularly egregious errors," which "seriously affect the fairness, integrity or public reputation of judicial proceedings." *Id.* (quoting *Frady,* 456 U.S. at 163, 102 S.Ct. at 1592; *United States v. Atkinson,* 297 U.S. 157, 160, 56 S.Ct. 391, 392, 80 L.Ed. 555 (1936)). This court reviews decisions for plain error on a case by case basis. *United States v. Thame,* 846 F.2d 200, 205 (3d Cir.), *cert. denied,* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 333 (1988). Factors relevant to our inquiry include "the obviousness of the error, the significance of the interest protected by the rule that was violated, the seriousness of the error in the particular case, and the reputation of judicial proceedings if the error stands uncorrected." *Id.*

Shirk contends that the district court committed plain error by failing to exclude MacReady's testimony under Fed.R.Evid. 702. Rule 702 permits a person with specialized knowledge to testify as an expert if it "will assist the trier of fact to understand the evidence or to determine a fact in issue." According to the advisory committee notes:

> There is no more certain test for determining when experts may be used than the common sense inquiry whether the untrained layman would be qualified to determine intelligently and to the best possible degree the particular issue without enlightenment from those having a specialized understanding of the subject involved in the dispute.

Fed.R.Evid. 702 advisory committee's note (quoting Ladd, *Expert Testimony,* 5 Vand. L.Rev. 414, 418 (1952)). Shirk argues that the average juror can fully comprehend the subject of structuring. Thus, he argues, MacReady's expert testimony on the subject was inadmissible under Rule 702.

Shirk also contends that MacReady's testimony was inadmissible under Fed.R.Evid. 704(b), which precludes expert testimony that states an opinion "as to whether the

---

8. In light of our conclusion that the Government did not have to prove Shirk knew structuring is illegal, we need not address his claim that the Government failed to prove such knowledge.

9. We have considered Shirk's other complaints regarding the jury instructions and find them to be without merit.

defendant did or did not have the mental state or condition constituting an element of the crime charged." MacReady defined "structuring" as a situation where a person "will *deliberately* break down a deposit or cause a deposit to be made which is under the ten thousand dollar filing limit." App. at 339 (emphasis added). He then offered his opinion that Shirk had structured the currency deposits and money order purchases charged in the indictment. According to Shirk, since MacReady's definition of "structuring" incorporated "deliberate[ness]," his opinion that Shirk "structured" transactions implied that did so "deliberately," that is, with the intent required for a conviction. Shirk also notes that MacReady's opinion was based in part on evidence that Shirk told an IRS agent of his intent to deposit the $80,680 found in one of his safes in amounts under $10,000 to avoid having CTR's filed with the IRS. To the extent that MacReady's opinion was based on this admission of intent, Shirk argues it improperly suggested that the transactions charged in the indictment were structured with the same wrongful intent.

We need not decide whether the district court erred by failing to exclude all or part of MacReady's testimony. Assuming *arguendo* that the district court erred, neither of the alleged errors was so obvious or "plain" that "the trial judge and prosecutor were derelict in countenancing it, even absent the defendant's timely assistance in detecting it." *United States v. Frady*, 456 U.S. 152, 163, 102 S.Ct. 1584, 1592, 71 L.Ed.2d 816 (1982). The presence of substantial alternative evidence supporting Shirk's conviction also counsels against a finding of plain error. *See Thame*, 846 F.2d at 207–08. Such evidence significantly diminishes the seriousness of any error that the district court might have committed.

First, the records introduced at trial evinced an ongoing pattern of deposits under $10,000, commencing only after Shirk received notification from the bank that his CTR filing exemption had been revoked. Specifically, the records showed that in the fourteen months prior to receiving notification, Shirk made over forty currency deposits in amounts greater than $10,000. In the eleven months after receiving notification, Shirk made over eighty currency deposits, but none in excess of $10,000. Second, Shirk simultaneously presented three money orders, each in amounts of just under $10,000, to purchase property at a real estate closing. Although presented together, the money orders were purchased on three separate days, all within two to three weeks prior to the closing.[10] Finally, Shirk admitted to an IRS agent that he planned to structure cash deposits of more than $80,000 to avoid having CTRs filed. Shirk's avowed intent to structure future transactions to evade the filing requirements circumstantially supported the conclusion that he structured the transactions in question for the same illicit purpose.

Because any error committed by the district court was not particularly obvious and Shirk's conviction was independently supported by other properly admitted evidence, admission of the disputed testimony did not impair the integrity of the trial or result in a miscarriage of justice.

## VI.

Having rejected Shirk's challenges to his conviction, we now turn to his sentence. Shirk claims that the district court misinterpreted the Sentencing Guidelines and, as a result, erroneously calculated his base offense level at thirteen, rather than at five. He also claims that the district court improperly increased his offense level by four points based on the finding that he structured funds in excess of $600,000. His challenge to the four-level increase focuses not on the district court's interpretation of the Guidelines, but on its factual finding that the structured funds exceeded $600,000.

10. The jury reasonably could infer from the fact that Shirk signed the money orders that he also purchased them.

■ We exercise plenary review over legal questions concerning the proper interpretation of the Sentencing Guidelines. *United States v. Inigo,* 925 F.2d 641, 658 (3d Cir.1991). We apply the clearly erroneous standard to factual determinations underlying the district court's application of the Guidelines. *Id; United States v. McDowell,* 888 F.2d 285, 292 (3d Cir.1989).

### A.

■ Sentencing Guidelines § 2S1.3(a) governs the determination of base offense level for a number of substantive offenses, including Shirk's unlawful structuring.[11] Section 2S1.3(a)(1) prescribes base offense level thirteen if a defendant: "(A) structured transactions to evade reporting requirements; or (B) knowingly filed, or caused another to file, a report containing materially false statements." Section 2S1.3(a)(2) prescribes base offense level five "otherwise." The commentary to the guideline simply tracks the language of the guideline itself: "A base offense level of 13 is provided for those offenses where the defendant either structured the transaction to evade reporting requirements or knowingly filed, or caused another to file, a report containing materially false statements. A lower alternative base offense level of 5 is provided in all other cases." U.S.S.G. § 2S1.3, comment. (backg'd.) (1991).

Guidelines section 2S1.3(a) and its commentary plainly mandate base offense level thirteen for Shirk because he structured transactions to evade federal reporting requirements. In arguing that the district court should have applied base offense level five, Shirk relies principally on the commentary to the former Guidelines § 2S1.3, which was in effect at the time of his offenses. Former Guidelines § 2S1.3(a)(1) (effective November 1, 1989) provides base offense level thirteen if the defendant "(A) structured transactions to evade reporting requirements; (B) made false statements to conceal or disguise the evasion of reporting requirements; or (C) reasonably should

have believed that the funds were criminally derived property." Section 2S1.3(a)(2) of the former Guidelines calls for base offense level five "otherwise." The commentary explains:

> A base offense level of *13* is provided for those offenses where the defendant either *structured the transaction to evade reporting requirements,* made false statements to conceal or disguise the activity, or reasonably should have believed that the funds were criminally derived property. *A lower alternative base offense label of 5 is provided in all other cases.* The Commission anticipates that such cases will involve simple recordkeeping or other more minor *technical violations* ... by defendants who reasonably believe that the funds at issue emanated from *legitimate sources.*

U.S.S.G. § 2S1.3, comment. (backg'd.) (1989) (emphasis added). As best we can tell, Shirk's argument is that the last sentence of the commentary implies that structuring to evade reporting requirements merits a base level of five under the former Guidelines if the structuring is "technical" and the structured funds are "legitimate." Shirk states that his structuring was "technical" because he had no unlawful objective, and that the funds he was convicted of structuring were "legitimate" business proceeds. Thus, he concludes, the former commentary calls for base offense level five.

■ We note that the Sentencing Commission's commentary should be regarded "as an integral part of the Guidelines package." *United States v. Bierley,* 922 F.2d 1061, 1066 (3d Cir.1990). Though ancillary to the actual Guidelines, *see United States v. Anderson,* 942 F.2d 606, 611 (9th Cir. 1991) (en banc), the commentary is generally regarded as more persuasive than ordinary legislative history, *see Bierley,* 922 F.2d at 1066. Unlike ordinary legislative history, which could reflect minority views as to the meaning of the described legislation, the commentary is passed by the Sentencing Commission as a whole and we

---

**11.** Except where otherwise indicated, we refer to the November 1991 Sentencing Guidelines and commentary, which were in effect at the time of Shirk's sentencing.

therefore regard it as a more accurate reflection of underlying intent.

■ We also note that Shirk is entitled to the benefit of former Guidelines and commentary if they are more favorable to him than the ones in effect at the time of his sentencing. Ordinarily, we must apply the Guidelines in effect at the time of sentencing. *See United States v. Badaracco,* 954 F.2d 928, 934 n. 4 (3d Cir.1992). However, where the Guidelines have been amended subsequent to the commission of the crime so as to increase a defendant's base offense level, *ex post facto* concerns require us to apply the earlier Guidelines. *See United States v. Kopp,* 951 F.2d 521, 526 (3d Cir.1991).

The former commentary on which Shirk relies, however, mandates an award of base level thirteen, not five. According to the commentary, base level thirteen applies whenever "the defendant ... structured the transaction to evade the reporting requirement." U.S.S.G. § 2S1.3, comment. (backg'd) (1989). Base level five can apply only in "other cases." *Id.* Because Shirk structured transactions to evade the reporting requirements, the commentary unambiguously requires that he receive base level thirteen. It makes no difference whether his structuring was in some sense "technical" or whether his structured funds were "legitimate." [12]

Contrary to Shirk's suggestion, our holding that base level thirteen applies in all cases where a defendant structures transactions for the purpose of evading the reporting requirements does not render the reference to base level five in the Guidelines superfluous or, as he puts it, ambiguous. We agree that an ambiguity would exist if base level five did not apply to any of the offenses covered by Guidelines § 2S1.3. As Shirk's counsel stated at the sentencing hearing, "[s]omething has to be a level 5" in order for section 2S1.3(a) to make sense. App. at 182. A review of the

statutes covered by section 2S1.3, however, reveal several offenses other than structuring to which base offense level five could apply.

For example, 31 U.S.C. § 5324(1) makes it unlawful to "cause or attempt to cause a domestic financial institution to fail to file a report required under section 5313(a)" for the purpose of evading reporting requirements. Furthermore, 31 U.S.C. § 5314 (1988) and applicable regulations require persons having an interest in or authority over a financial account in a foreign country to report any such relationship to the Commissioner of Internal Revenue. *See* 31 U.S.C. § 5314 (1988); 31 C.F.R. § 103.24 (1992). Finally, 26 U.S.C. §§ 6050I (1988 & Supp. II 1990) and 7203 (Supp. II 1990) criminalize, among other things, the willful failure of a person engaged in a trade or business to report a transaction resulting in the receipt of more than $10,000 in cash. The gravamen of each listed offense is willfully failing to file, or willfully causing another to fail to file, a required financial report. Because the culpable conduct does not involve structuring or the filing of a false report, base offense level five would apply. *See* U.S.S.G. § 2S1.3(a).

### B.

■ Finding that Shirk structured transactions involving more than $600,000, the district court increased Shirk's offense level by four levels, from thirteen to seventeen. The Guidelines provide for an enhancement of the defendant's offense level if the base offense level is thirteen and the value of the structured funds exceeds $100,000. U.S.S.G. § 2S1.3(b)(2). A four-level increase is prescribed where the funds exceed $600,000. U.S.S.G. § 2S1.1(b)(2)(E).

Shirk argues that the evidence showed a series of deposits over eleven months adding up to more than $600,000, but that the Government failed to prove which deposits

---

**12.** Even if the earlier Guidelines or commentary did prescribe base level five for "technical" structuring, Shirk's offense still would not qualify. The evidence established that, for almost a year, Shirk engaged in an ongoing plan to structure currency transactions involving more than

$600,000 for the specific purposes of evading federal reporting requirements and depriving the government of information to which it was legally entitled. By any reasonable definition, Shirk's structuring was not "technical."

in the series were in fact "structured." Substantial evidence supports a finding that Shirk structured all the currency deposits made after his CTR filing exemption was revoked. These deposits total in excess of $600,000. Consequently, the district court properly increased Shirk's offense level by four levels.

## VII.

We last address the Government's cross-appeal. The Government claims that the district court erred in departing downward from the applicable Sentencing Guidelines range. The Government also contends that the district court erred in failing to impose a two-level enhancement under the Guidelines for obstruction of justice. We will review these objections separately.

### A.

■ A sentencing court must impose a sentence within the range prescribed by the Guidelines unless "the court finds that there exists an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the Sentencing Commission in formulating the Guidelines and that should result in a sentence different from that described." 18 U.S.C. § 3553(b) (1988); U.S.S.G. § 5K2.0. "This provision is mandatory." *United States v. Uca*, 867 F.2d 783, 786 (3d Cir. 1989). When determining whether a circumstance was adequately taken into consideration, "the court shall consider only the sentencing guidelines, policy statements, and official commentary of the Sentencing Commission." 18 U.S.C. § 3553(b). Whether circumstances have been adequately considered by the Sentencing Commission is subject to plenary review. *United States v. Shoupe*, 929 F.2d 116, 119 (3d Cir.), *cert. denied*, —— U.S. ——, 112 S.Ct. 382, 116 L.Ed.2d 333 (1991).

■ The district court believed Shirk's conviction to be "atypical" because: (1) Shirk was acquitted on criminal tax charges; (2) it appeared that he "only structured legitimate business proceeds into his own legitimate bank accounts;" (3) he may not have realized structuring was a criminal act; and (4) he was subject to a substantial forfeiture. App. at 240. For these reasons, the district court concluded that a downward departure was appropriate pursuant to Guidelines § 5K2.0. We hold that the factors relied upon by the district court were adequately taken into consideration by the Sentencing Commission and were not valid grounds for departure.

The mere fact that Shirk was acquitted of criminal tax evasion does not in any way diminish his culpability for the structuring offenses he committed, and does not make Shirk's conviction "atypical" under the Guidelines. Shirk's acquittal on the tax counts, therefore, is not grounds for departing from the Guidelines. Even if, as the district court concluded, Shirk's acquittal is evidence that he structured only legitimate business proceeds, not laundered money, a downward departure still would not be warranted. The Sentencing Guidelines provide for a four-level increase from the base offense level due to the specific offense characteristic that "the defendant knew or believed that the funds were criminally derived property." U.S.S.G. § 2S1.3(b)(1). It follows that in circumstances where the defendant did not structure or believe he or she was structuring criminally derived property, the Commission intended the base offense level to remain unchanged.

Nor is it relevant that Shirk might not have known that structuring is illegal. Although there may be occasional if not rare instances in which ignorance of the law is grounds for a downward departure, no departure is appropriate where, as here, a proven element of the defendant's crime is the purposeful evasion of a known legal requirement. The jury convicted Shirk because, as required by 31 U.S.C. § 5324(3), evidence established beyond a reasonable doubt that he knew of the federal CTR filing requirements and structured transactions "for the purpose of evading" those requirements. The Guidelines very clearly prescribe base offense level thirteen and certain potential upward adjustments for individuals, such as Shirk, whose only cul-

pable conduct is "structur[ing] transactions to evade reporting requirements." U.S.S.G. § 2S1.3(a)(1)(A). Shirk simply cannot contend that he possessed a diminished *mens rea* not adequately taken into account by the Guidelines.

Finally, Guidelines § 5E1.4 states that "[f]orfeiture is to be imposed upon a convicted defendant as provided by statute." It is apparent from this section, which has been in existence since the Guidelines' inception in November 1987, that the Commission considered forfeiture when creating the guideline ranges for terms of imprisonment. The fact that the forfeiture statute covering structuring offenses has been amended since 1987 to increase the amounts subject to forfeiture does not alter our analysis. We interpret the Guidelines' straightforward mandate that "forfeiture is to be imposed ... as provided by statute" to mean that the Commission viewed monetary forfeiture as entirely distinct from the issue of imprisonment. For this reason, the district court improperly relied on Shirk's exposure to forfeiture as grounds for its downward departure.

### B.

■ The Government also argues that the district court erred in failing to impose an enhancement for obstruction of justice. The Guidelines provide for a two-level increase in a defendant's offense level "if the defendant willfully obstructed or impeded, or attempted to obstruct or impede, the administration of justice during the investigation, prosecution, or sentencing of the instant offense." U.S.S.G. § 3C1.1. Included among the Guidelines' examples of conduct to which the enhancement applies is "providing materially false information to a probation officer in respect to a presentence or other investigation for the court." U.S.S.G. § 3C1.1, comment. (n. 3(h)).

■ The Government argues that Shirk's sentence should be enhanced because he provided the probation officer with false information on a sworn financial statement. There is no serious dispute as to whether Shirk supplied false informa-

tion. However, Guidelines § 3C1.1 plainly requires that a defendant "willfully". obstruct or attempt to obstruct the administration of justice. Because the Government seeks the enhancement, it bears the burden of proving willfulness by a preponderance of the evidence. *See United States v. Belletiere,* 971 F.2d 961, 965 (3d Cir.1992). Furthermore, where a defendant provides false information to a probation officer, the information must be "materially" false. U.S.S.G. § 3C1.1, comment. (n. 3(h)).

In its memorandum to the court, the probation officer recommended against an enhancement for obstruction of justice, reasoning that the false information provided by Shirk was not material. Consistent with the probation officer's recommendation, the district court denied the enhancement, but made no finding on the issue of materiality. Instead, the district court accepted the possibility that "there were too many cooks in there spoiling the broth because of forms being passed back and forth from one person to another," and concluded that Shirk did not "obstruct[ ] justice in the sense in which I speak of that term." App. at 213. We interpret the district court's statements to imply that Shirk did not obstruct justice "willfully."

We apply the clearly erroneous standard in reviewing the district court's determination that Shirk did not "willfully" obstruct justice. *See United States v. Cusumano,* 943 F.2d 305, 315 (3d Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 881, 116 L.Ed.2d 785 (1992). The Government in its brief makes no attempt to demonstrate that the district court's findings as to willfulness are clearly erroneous, apparently assuming that the only disputed issue is whether Shirk's misstatements were material. Our own review of the record persuades us that the district court's findings are not clearly erroneous. Consequently, we hold that the district court did not err in declining to apply an enhancement for obstruction of justice.

### VIII.

For the foregoing reasons, we will affirm Shirk's conviction but will remand to the

district court for resentencing with this opinion including any calculation of the appropriate sentence by reason of any facts or law which have not been considered by the opinion.